**WISCONSIN MUSIC NETWORK, INC., Plaintiff,**

v.

**MUZAK LIMITED PARTNERSHIP, Defendant.**

No. 92–C–874.

United States District Court, E.D. Wisconsin.

Dec. 4, 1992.

---

W. Stuart Parsons and James Brennan, Quarles & Brady, Milwaukee, WI, for plaintiff.

Andrew Riteris and Joshua Gimbel, Michael, Best & Friedrich, Milwaukee, WI, George E. Greer, Heller, Ehrman, White & McAuliffe, Seattle, WA, for defendant.

## DECISION AND ORDER

RANDA, District Judge.

■ Before the Court is Wisconsin Music Network Inc.'s ("WMNI") motion for a temporary restraining order and preliminary injunction to prevent the cessation of its forty-seven year relationship with Muzak Limited Partnership ("Muzak"). Before a preliminary injunction will issue, the movant must show, as a threshold matter, that: 1) they have no adequate remedy at law; 2) they will suffer irreparable harm if the injunction is not granted; and 3) they have *some* likelihood of success on the merits in the sense that their "chances are better than negligible." *National People's Action v. Wilmette*, 914 F.2d 1008, 1010 (7th Cir.1990) (quoting *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386–87 (7th Cir.1984)). Because WMNI has failed to show that it has some likelihood of success on its claim that Muzak has terminated it in violation of the Wisconsin Fair Dealership Law ("WFDL"), WMNI has not met its required burden for the issuance of a preliminary injunction and its motion must be denied.

### I

### Procedural Background

On August 17, 1992 WMNI filed suit against Muzak in the circuit court of Milwaukee county seeking injunctive relief for various alleged violations of the WFDL, Chapter 135, Wis.Stats. (Count I), Federal and Wisconsin antitrust laws (Counts II & III), contractual duties (Count IV), and tortious interference by Muzak with WMNI's contractual duties (Count V).[1] On August 18, 1992, Muzak filed its Notice of Removal invoking this Court's diversity jurisdiction pursuant to 28 U.S.C. §§ 1332, 1441, 1446 and its original jurisdiction pursuant to 28 U.S.C. § 1331. In addition to the briefs filed, oral argument was heard on October 28, 1992 and post-hearing briefs were submitted by both parties.

---

1. At the preliminary hearing held on October 28, 1992, the parties significantly narrowed the issues in dispute. For purposes of this motion, the Court need only address two of the remaining issues: 1) Has Muzak discriminated against WMNI in violation of the WFDL, and 2) Does the Multi–Territory Account ("MTA") program violate the antitrust laws.

## II

## Factual Background

While WMNI and Muzak have been doing business with one another for almost half a century, this Court's review of their relationship need only extend as far back as 1980. The 1980 "License Agreement", by its terms, expired on March 31, 1989. *See* 1980 Agreement, § 3 p. 10, Exhibit A of WMNI's Complaint Index ("1980 Agreement"). The 1980 Agreement stated in part that if Muzak failed to give notice two years prior to March 31, 1989 that it intended not to renew WMNI, Muzak was required to offer WMNI a new license agreement which it was then offering to like situated licensees.[2] 1980 Agreement, § 3 p. 13. At the time of expiration, Muzak was involved in negotiations with the International Planned Music Association ("IPMA"), an association of Muzak affiliates. The purpose of these negotiations was to draft a new system-wide license agreement which would reflect changes both in technology and in the market place. Because of these negotiations, Muzak could not offer any of its affiliates a new agreement, but instead continued expired agreements on a month to month basis. Jester Declaration, ¶ 11.

In September of 1990, the new form of agreement was unanimously approved by the Board of the IPMA. It was also approved by the Wisconsin Department of Securities on January 15, 1991. On January 31, 1991, Muzak offered the new agreement to WMNI. Jester Declaration, ¶ 19. That letter, which Muzak sent to all similarly situated affiliates, advised WMNI that if it did not sign the new agreement, Muzak would assume that WMNI did not desire to continue the relationship. With the exception of WMNI and Washington, D.C., all similarly situated affiliates accepted the new agreement.[3] Jester Declaration, ¶ 18. On February 12, 1991, Muzak advised WMNI, then being continued on a month to month basis, that it would be terminated unless the new agreement was

signed. After more than a year of negotiating, Muzak, by letter dated June 23, 1992, advised WMNI of its intention to terminate the relationship 60 days from receipt of the letter, unless the new agreement was signed. Jester Declaration, ¶ 29. On August 17, 1992, WMNI filed this action. The parties have since agreed that the effective date of termination will be December 7, 1992. (October 5, 1992 letter to the Court from Muzak's counsel Andrew Riteris)

## III

## Statute of Limitations

■ As a preliminary matter, the Court shall address Muzak's argument that WMNI's claim is barred by the WFDL's 1 year statute of limitations. Wis.Stat. § 893.-93(3) provides:

> "Miscellaneous Actions ... The following actions shall be commenced within one year after the cause of action accrues or be barred: ... (b) An action under ch. 135."

Muzak cites as authority *Les Moise, Inc. v. Rossignol Ski Co.,* 122 Wis.2d 51, 361 N.W.2d 653 (1985). Muzak argues that the February 12, 1991 letter notice is the date this cause of action accrued. That letter stated that the relationship would end on April 30, 1991 if WMNI did not sign the new agreement. The Court agrees that *Les Moise* would control this case if, in fact, Muzak had terminated WMNI on April 30, 1991.[4] *Les Moise* holds that a cause of action accrues upon notice of termination, but because Muzak did not terminate WMNI on April 30, 1991, the February 12, 1991 notice was, in effect, no notice at all. WMNI's action would be untimely only if Muzak had terminated the relationship on April 30, 1991.

## IV

## Wisconsin Fair Dealership Law

WMNI's argues that Muzak has "terminated" it without good cause in violation of the

---

2. The parties use the terms affiliate and franchisee interchangeably.

3. This is a point of dispute between Muzak and WMNI. As the Court will discuss further, all similarly situated affiliates are being treated identically.

4. In *Les Moise,* Rossignol (grantor) sent Les Moise (dealer) notice in January of 1980 that termination would be effective on May 21, 1980, the date of the expiration of their agreement. Suit was filed by Les Moise on April 14, 1981, within one year of the date of actual termination, but more than one year after notice had been given.

WFDL.[5] The Court must first determine the character of this dispute. WMNI claims this is a termination case. It has argued extensively that Muzak and WMNI currently have a valid agreement, identical in form to the 1980 Agreement.[6] (WMNI's Post–Hearing Brief, p. 20, § C.) Muzak argues that WMNI simply refuses to sign onto the *new* agreement.

Under the terms of the 1980 Agreement, Muzak was required to offer WMNI a new agreement in March of 1989 which "shall correspond to the form of license agreement which Licensor (Muzak) was then bona fide offering to licensees or prospective licensees....". (1980 Agreement, § 3, p. 13) Because Muzak had no agreement to offer at that time, it extended WMNI's franchise on a month to month basis (as it did with other affiliates) according to the terms of the 1980 Agreement. Because the parties agreed to operate under the terms of the 1980 Agreement, on a month to month basis until a new agreement could be offered to all like situated affiliates, the 1980 Agreement expired upon appearance of the new agreement. No other conclusion can be drawn from these facts. Now that the new agreement has been presented, WMNI cannot claim that it is being terminated. In relation to the proposition that the offer of a new contract with different terms amounts to a termination, Judge Shabaz, in *Meyer v. Kero–Sun, Inc.* stated, "Although interesting and novel, the theory is nonsense." 570 F.Supp. 402, 406 (W.D.Wis.1983) The Wisconsin Supreme Court, on similar facts, concluded in *Ziegler v. Rexnord:*

> "This case does not involve a termination of the original contract, but rather a failure to renew the relationship because the dealer allegedly refuses to substantially comply with essential, reasonable and non-discriminatory requirements sought to be imposed on the dealer by the grantor."

147 Wis.2d 308, 433 N.W.2d 8, 14 (1988). The only logical interpretation of the facts is that Muzak is failing to renew WMNI because of WMNI's refusal to sign onto the new agreement. *Ziegler* examined § 135.03 of the WFDL and determined that a grantor may fail to renew a dealer if it can show good cause.[7] Accordingly, Muzak must shoulder the burden of establishing good cause for its failure to renew. *See* ftn. 5, Wis.Stat. § 135.03.

Good cause pursuant to § 135.02 focuses on the dealer's refusal to comply with *non-discriminatory, essential* and *reasonable* requirements *imposed* or *sought to be imposed* by the grantor. Since WMNI's refusal to comply is established, the Court must now determine whether the proposed changes contained in the new agreement are 1) non-discriminatory, 2) essential, and 3) reasonable. If they are, The WFDL does not afford WMNI any relief.

### Muzak's Treatment of like-situated Affiliates

WMNI contends that Muzak is discriminating against it because only one hundred (100) of one hundred and sixty (160)

---

5. Wisconsin Fair Dealership Law, Chapter 135, Stats. The two sections relevant to this decision;

   Wis.Stat. § 135.03 **Cancellation and alteration of dealerships.** "No grantor, directly or through any officers, agent, or employee, may terminate, cancel, fail to renew, or substantially change the competitive circumstances of a dealership agreement without good cause. The burden of proving good cause is on the grantor."

   Wis.Stat. § 135.02(4) **"Good Cause" means:** (a) "Failure by a dealer to comply substantially with essential and reasonable requirements imposed upon him by the grantor, or sought to be imposed by the grantor, which requirements are not discriminatory as compared with requirements imposed on other similarly situated dealers either by their terms or in the manner of their enforcement." (b) "Bad Faith by the dealer in carrying out the terms of the dealership."

6. What is unclear about WMNI's position is whether it believes the term of its contract is month to month or nine years as under the 1980 Agreement. If its position is the former, this cannot be a termination case, if it is the latter, it is incorrect.

7. The court in *Ziegler* further stated, "We hold that when a dealer refuses to substantially comply with the terms of a contract offered by the grantor, the grantor may have good cause to terminate, cancel, or fail to renew the relationship at the expiration of the original contract, provided the requirements imposed by the grantor are essential, reasonable and non-discriminatory."

affiliates have been required to sign the new agreement. (WMNI's Reply Memoranda, p. 5) Further, of these remaining sixty (60), there are affiliates with expired agreements that have not been forced by Muzak to sign the new agreement. The affiliates referenced by WMNI are Washington, D.C., and those owned by Comcast. (WMNI's Reply Memoranda, p. 5) However, with the exception of the Washington, D.C. affiliate, the remaining affiliates are not similarly situated because their agreements with Muzak have not expired.

Per a 1979 letter agreement with Muzak, Comcast acquired or could acquire various affiliates. Paragraph 7 of that agreement provides that "Anything in the Agreement notwithstanding, the term of the Agreement shall be 15 years from the date thereof." (Muzak's Preliminary Hearing Exhibit 130, p. 3, *see also* Jester Testimony, p. 24, L. 8–12 and p. 30, L. 3–9) Therefore, the agreements of these Comcast affiliates do not expire until 1994. (Jester Testimony, P. 68, L. 10–19 and L. 20–25) Thus, Washington, D.C. is the only "like-situated" affiliate not to have signed the new agreement.

For purposes of the WFDL, Muzak must treat the Washington, D.C. affiliate as it is treating WMNI. The evidence shows that it has done so. The Washington, D.C. affiliate, (Music, Inc.) is required, as is WMNI, to sign the new agreement or not be renewed. (February 6, 1992 letter, Muzak's Hearing Exhibit 129) Accordingly, the Court finds that Muzak is not discriminating against WMNI in violation of the WFDL.

### The Essential and Reasonable Requirements of the New Agreement

■ WMNI advances two arguments that the provisions of the MTA program in the new agreement are not essential and reasonable. First, because Muzak has not forced the other affiliates with unexpired agreements to sign on, the MTA must not be an essential program. (WMNI's Post–Hearing Brief, p. 19–20)

Muzak and the IPMA counter that the MTA is a competitive necessity. Among the many features of the MTA is the ability to provide uniform service, achieve economies of scale, negotiate standardized rates, and a single service contract rather than a separate contract for each location. (Muzak's Opposition Brief, p. 4 and Muzak's Post–Hearing Brief, p. 5–6; Johnson [Montgomery Ward] Affidavit ¶2; Westling [Dayton Hudson] Affidavit ¶7; Hanson [Famous Footwear] Affidavit, ¶4, "If Muzak had been unable to offer us a national contract, we would have gone with another music provider."; Boyd Affidavit, ¶8, Raddatz Affidavit ¶8, "We would have lost the Walgreen's Account if not for our ability to provide national service.") In fact, John Carroll, who negotiated the new agreement on behalf of the IPMA, stated at his November 12, 1992 deposition, "It was the perception of the IPMA and the IPMA Board of Directors that Muzak was, for want of a better phrase, having its brains beaten out in the national account marketplace by 3M and AEI and . . . absent a multi-territory account provision, we would see our subscriber base—franchisees—would see their subscriber base completely undermined." (Carroll Deposition, p. 65–66)

WMNI offers a weak response to the evidence that the MTA is an essential and reasonable program. Its argument that Muzak's decision not to force affiliates operating under valid, unexpired agreements to comply proves the MTA is not essential fails to take into account two key facts. First, those agreements have yet to expire, and second, in every case where an affiliate's agreement has expired, Muzak has uniformly required the affiliate to sign the new agreement that includes the MTA program. In essence, WMNI is asking the Court to require Muzak to attempt to renegotiate the remaining 59 unexpired agreements before Muzak can prove the MTA program is reasonable and essential. The Court declines to do so and accepts the evidence provided by the Board of Directors of the IPMA, counsel for the IPMA, and various national subscribers as more than sufficient to show that the MTA program is essential and reasonable.

As a second argument, and one deserving much closer scrutiny, WMNI claims that the MTA is a violation of the antitrust laws. "As a matter of law, the MTA . . . cannot be reasonable and essential under the WFDL if [it] violates the antitrust laws." (WMNI's

Post–Hearing Brief at p. 18, citing *Menominee Rubber Co. v. Gould, Inc.,* 657 F.2d.164, 166–67 (7th Cir.1981)) The parties have extensively briefed the antitrust implications of the MTA. After consideration of the structure of the MTA program and the relevant case law, the Court finds no violation of either § 1 of the Sherman Act or § 3 of the Clayton Act.[8]

Of the various allegations in the complaint, the only remaining aspect of the new agreement which WMNI claims is a violation of the antitrust laws is the MTA program.[9] Accordingly the Court will limit its analysis to two (2) specific issues: 1) Whether the MTA program is voluntary, and 2) Whether the MTA committee is "price fixing".

### 1) Whether the MTA Program is voluntary

WMNI strenuously argues that the MTA is a violation of the antitrust laws because it is not voluntary and because WMNI is not free to market to outlets in its territory. "Muzak and its licensees are violating established antitrust law unless the MTA Program is voluntary." (WMNI's Post–Hearing Brief, p. 3–8 citing *Ohio–Sealy Mattress Mfg. Co. v. Sealy, Inc.,* 585 F.2d 821, 836–839 (7th Cir.

1978), *cert. denied,* 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979)).

The MTA program provides that a potential MTA Subscriber is one which has fifty (50) or more outlets in the territories of at least four (4) Muzak affiliates. (MTA Program, § 1.6(a)) The affiliate, in whose territory the potential Subscriber's headquarters is located, must first consent to the inclusion of the Subscriber on the Multi–Territorial Account List.[10] Once a potential Subscriber is put on the MTA Account List, the Assigned Person is responsible for marketing to that Subscriber.[11] It is left to the affiliate, however, to decide if it wishes to act as the Assigned Person.[12] (Exhibit 5, §§ 1.7, 2.1, Jester Hearing Testimony p. 20, L. 12–21) In the case where a Subscriber's headquarters is not located in an affiliate's territory that affiliate, by definition, cannot be the Assigned Person and cannot therefore market to an already established MTA account located in said affiliate's territory unless consent is given by the party designated as the Assigned Person for that account. (MTA Program § 2.1, ftn. 14)

Thus, two distinct fact situations exist where the issues of voluntariness and the freedom to market are tested. The first is

---

8. The Sherman Antitrust Act, 15 U.S.C. § 1 provides in pertinent part:

   "Every contract, combination in the form of trust or otherwise, or conspiracy, *in restraint of trade* or commerce among the several States, or with foreign nations, is hereby declared illegal." (emphasis added)

   The Clayton Act, 15 U.S.C. § 14 provides in pertinent part:

   "It shall be unlawful for any person engaged in commerce ... to ... *fix a price* charged therefor, or discount from or rebate upon ... where the effect of such lease, sale, or contract ..." may be *to substantially lessen competition* or tend to create a monopoly in any line of commerce." (emphasis added)

9. Muzak's Post–Hearing Memorandum at p. 2.

   WMNI's Post–Hearing Memorandum at p. 2.

10. MTA Program, Section 1.7 provides in pertinent part: No Subscriber shall be added to the Multi–Territorial Account List without the prior written consent of the Affiliate in whose Muzak territory the headquarters of such Subscriber is located.

    Mr. Carroll, the attorney who represented the IPMA in its negotiations with Muzak, testified to

a slight variation in how the program works in actual fact:

"... the national account program contemplates that there will be a list prepared of accounts which the national account committee believes should be targeted for sales. The program then also contemplates that the list will be distributed among the franchisees and the franchisees have the ability to exclude from that list, to deny the national account committee the ability to go after any account that is inside their territory, headquartered inside their territory." (Carroll Deposition, P. 27, L. 7–17)

11. § 1.7 defines the **Assigned Person** as "... the person or entity who is assigned responsibility for the multi-territory marketing of the Services to each such Multi–Territory Account, which person or entity shall in each case be *either* **Muzak or the Affiliate licensed by Muzak to operate in the Muzak Territory in which the headquarters of the Multi–Territory Account are located.**

12. Even though §§ 1.7 and 2.1 are silent on the matter, the Court takes as fact Mr. Jester's testimony that Muzak becomes the Assigned Person only after the Affiliate has declined. "The Affiliate gets to make that choice." (Jester Hearing Testimony, P. 20, L. 21)

where the headquarters of a potential or existing MTA Subscriber is located in WMNI's territory, and the second is where an outlet, but not the headquarters, of an existing MTA Subscriber is located in WMNI's territory.[13] WMNI points to sections 2.1,[14] and 2.2 [15] of the MTA, and section 9.1 [16] of the new Licensing Agreement for its proposition that WMNI is not free to market to the outlets of MTA accounts (thereby precluded from competing) and must provide services according to a "fixed price". These terms and conditions cited by WMNI and applied to the fact situations outlined above do not produce the conclusions WMNI asks the Court to reach.

### Where the Headquarters of a Potential Subscriber are in WMNI's Territory

■ Where the headquarters of a Subscriber are in WMNI's territory, WMNI may approach any outlet and attempt to market its services *prior* to placing a Subscriber on the MTA List. (Jester Hearing Testimony, P. 23, lines 1–13) All of the provisions cited by WMNI have no effect unless and until WMNI has placed the Subscriber on the MTA List. This "pre-listing" capacity suggests the voluntary and competitive nature of the MTA. Second, WMNI is free to place or decline to place a potential Subscriber on the MTA List. (Exhibit 5, § 1.7) Third, once it has placed the Subscriber on the List, WMNI is free to choose to become the Assigned Person. *See* ftn. 12. Finally, if WMNI decides not to become the Assigned

Person, it may decline to provide services to the Subscriber if it determines that to do so would be contrary to its economic interests.[17] Considering the evidence and the motivation of subscribers for seeking nation-wide treatment, WMNI may not be successful in convincing a potential Subscriber that it can offer something better than the MTA program, but this lack of success does not violate the antitrust laws. *Sealy* at 837.

### Where WMNI will service the outlet of an MTA Account headquartered in a different Territory

■ The second factual situation where the issues of voluntariness and the freedom to compete are tested exists where WMNI decides whether to service the outlet of an MTA Account which is headquartered in a different territory. In this situation, another affiliate, not WMNI, has decided to place the Subscriber on the MTA List. Once the other affiliate has placed the Subscriber on the MTA List, WMNI is foreclosed from marketing to that account's outlets. (§ 2.1 of the MTA) Nevertheless, WMNI is not prevented from approaching the outlet of an MTA Account not yet signed, or conceivably not covered by an existing MTA Account. In fact, Carroll stated that affiliates continue to contact local outlets of a national account even after it has been placed on the list. Until the national account "rolls out, ... Muzak franchisees contact directly local branches or locations of national accounts."

13. The provisions of MTA program are set forth in WMNI's Hearing Exhibit 5.

14. Section 2.1 provides in pertinent part:
"Unless Licensee is the Assigned Person with respect to such Account, Licensee will not independently approach a Multi–Territory Account location for marketing purposes without the prior written consent of the Assigned Person."

15. Section 2.2 provides in pertinent part:
"The specific terms (pricing, length of contract, etc.) set forth in the Multi–Territory Account Contract with a specific Multi–Territory Account shall be as determined by the Committee subject to section 3.2 below ... Licensee understands and agrees that, in performing its obligations and exercising its rights with respect to a Multi–Territory Contract, Licensee shall be bound by the terms set forth therein and shall have no right independently to amend or otherwise alter any such terms."

16. Section 9.1 of the new License Agreement provides in pertinent part:

"Licensee and Muzak agree to participate in the Multi–Territory Accounts Program as set forth in Exhibit G and otherwise to abide by the terms of Exhibit G. Without limiting generality of the foregoing, Licensee agrees to participate during the term of this Agreement in all multi-territory contracts (as defined in Exhibit G) that pertain to subscriber premises in the territory."

17. § 5.2 of the MTA Program provides in part:
"... an Affiliate operating from a Muzak territory that is adjacent to the failing Affiliate's Muzak territory, as selected by the Committee, shall thereafter be authorized to perform the obligations and exercise the rights ... under such contract." *See also* Gould Testimony, P. 46 L. 20 to P. 47 L. 9.

(Carroll Deposition, P. 74, L. 25 to P. 75, L. 6) Further, nothing prohibits a prospective MTA account from deciding not to deal with the assigned person and contacting individual affiliates. (Carroll Deposition, P. 74, L. 1–6) In this context, the restriction on an affiliate's ability to approach an MTA account which has been signed does not create an antitrust violation. "The mere fact that the parties to an agreement eliminate competition between themselves is not enough to condemn it." *Appalachian Coals, Inc. v. United States*, 288 U.S. 344, 360, 53 S.Ct. 471, 474, 77 L.Ed. 825 (1933) In the instant case, while there is a restriction on an affiliate's freedom to approach once the agreement is signed, it does not come close to an elimination of competition. The Court agrees with Muzak that, "... [A]ny diminution of competition related to restrictions on WMNI under the MTA program is to *intra* brand competition, and results from steps taken to increase *inter* brand competition." As the Court stated in *Westman Comm'n Co. v. Hobart Int'l, Inc.,* "The evil to be avoided is the reduction of *inter* brand competition ..., not the reduction of *intra* brand competition." 796 F.2d 1216, 1229 (10th Cir.1986). While the restriction on WMNI's freedom to approach an operating MTA account might have the affect of lessening intrabrand competition, it does not rise to an antitrust violation.

Because (taking into account both of the aforesaid fact situations) nothing in the new MTA program requires WMNI to put an account on the MTA List, nor requires WMNI to participate, nor prevents WMNI from withdrawing, the Court finds that the MTA program is voluntary to the extent required by *Sealy.*[18]

18. In *Sealy* the Seventh Circuit found that Sealy's National Accounts Program did not violate the antitrust laws. The Court stated: "Any licensee was free not to participate, and to negotiate directly with the customer in an attempt to supply all or any part of the customer's needs. While a licensee was in the program, however, it was obligated to supply the customer's outlets in its APR with the specified products *at the agreed price*." (emphasis added) *Id.* 585 F.2d at 837. The Court further stated, "Even though a licensee might originally elect to participate, it was

## 2) **The MTA Committee**

WMNI asserts that the MTA Committee fixes prices in violation of the antitrust laws. The MTA program establishes a six member committee comprised of three representatives of the IPMA, two Muzak employees, and one franchisee appointed by Muzak. While the hybrid nature of the committee might require an exhaustive analysis of whether the alleged price fixing is "vertical" or "horizontal", no such analysis need be undertaken where the committee does not fix prices as understood in antitrust law. This is not a situation where competitors have bound together to fix the price at which their product would be sold. In fact, the prices of various MTA accounts differ.[19] Muzak and its affiliates could not offer national treatment unless an arrangement, like the MTA program, was in place.

"Around the same time that the new agreement was being negotiated, many of our larger national chain customers were beginning to ask for national pricing and service.... We felt the MTA program was necessary in order to enable us to compete with AEI and 3M.... The MTA program has certainly allowed my franchises to keep customers that we would have otherwise lost to our competitors."

Boyd Aff., ¶ 7.

WMNI is correct in arguing that there is no business justification defense to an antitrust violation. *Greene v. General Foods Corp.,* 517 F.2d 635, 657 (5th Cir. 1975); *Bostick Oil Company v. Michelin Tire Corporation,* 702 F.2d 1207, 1217 (4th Cir.1983) But no antitrust violation is evident in the MTA program. The instant case is easily distinguishable from the cited cases. As a whole, these cases describe an intended scheme whereby some deleterious effect re-

perfectly at liberty at any time to withdraw from the program and to begin negotiations with the customer." *Id.* at 837. While WMNI might seize upon the distinction that Muzak affiliates, while free to withdraw, may not compete where a valid MTA agreement exists, the Court is not persuaded that the MTA program's restriction on the time at which WMNI may compete, removes this case from the holding in *Sealy.*

19. *See* Exhibit A attached to Jester's November 9, 1992 Declaration.

sults to either consumers or other competitors. In *Greene* the distributor was forced to sell at a pre-set price to any and every Multiple Food Service Account ("MFSA"). The 5th Circuit, in finding antitrust violations, discussed two particularly onerous characteristics of the MFSA program. The Court found that General Foods did not engage in open-ended price negotiation with the MFSAs in setting its across-the-board price.[20] It further considered that the distributor was forced to sell at the pre-set price regardless of the risk or investment that had been undertaken.[21] *Id.* at 656. Neither of these characteristics are present in the Muzak MTA program. The MTA committee does not force an across-the-board price that affiliates must charge. The Committee adopts "general pricing guidelines" that gives the Assigned Person the range within which to negotiate with each individual MTA customer. (Jester Testimony, P. 20, L. 22 to P. 21, L. 4; Exhibit 5, ¶ 3.2) Further, if the Assigned Person cannot make a MTA sale at a price within those guidelines, he returns to the MTA committee for authority to offer lower prices and/or improved terms and conditions. (*Id.* at P. 21, L. 5 to L. 14) Lastly, The affiliate may opt out if it determines that the price and or risk is unacceptable.

In *Bostick,* the 4th Circuit found that Michelin, the manufacturer, set the prices at which its dealers could sell. As in *Greene,* the dealer was forced to sell at prices that did not reflect his risk. *Bostick* at 1212. Unlike the MTA program, Michelin set "uniform prices to all participating customers." *Id.* at 1217. Both *Greene* and *Bostick* involved pre-set, uniform prices which the dealer had to offer regardless of his investment or risk. These antitrust violations are not present in the MTA program.

The MTA program does not restrain trade as between Muzak, AEI, and 3M. If anything it creates more competition in the market for music service delivery by allowing Muzak and its affiliates to offer national treatment. The result is that instead of two competitors offering national programs, there are now three. It is beyond dispute that an increase in the number of competitors in the market will benefit potential subscribers. Further, subscribers who qualify for the MTA program would hardly tolerate "fixed prices". (Muzak's Post–Hearing Brief, p. 9; Jester Testimony, P. 22, L. 10 to L. 19.) As Muzak cogently argues, "the best proof that MTA prices are not "fixed" by the MTA Committee ... is that there is not a uniform MTA price. In fact, price terms in the MTA contracts vary." (Muzak's Post–Hearing Brief, p. 10; Jester Hearing Testimony, P. 22, L. 20 to L. 25.; Jester Declaration & Exhibit A of November 9, 1992)

The MTA program is not a price fixing scheme. Rather, it is a mechanism by which individual affiliates combine to provide a service that no single one could provide. Accordingly, the Court's consideration of the structure of the MTA program, falls squarely within the holding of the Supreme Court in *Broadcast Music, Inc. v. Columbia Broadcasting Systems, Inc.,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979).

> "Joint ventures and other cooperative arrangements are not usually unlawful, at least not as price fixing schemes, where the agreement on price is necessary to market the product at all."

*Id.* at 23, 99 S.Ct. at 1564.

The MTA program does not violate the antitrust laws.

On the record presented, the new agreement's terms and requirements are reasonable, essential, and nondiscriminatory and Muzak has shown good cause for non renewal because of WMNI's failure to comply with said agreement. WMNI has not demonstrated any likelihood of success on the merits.

---

**20.** "... The record suggests that MFSA prices are determined unilaterally by General Foods in accordance with its own system of allowances for quantity buying and other factors, rather than negotiated at the bargaining table with each MFSA." *Greene* at 655.

**21.** "This concern for the autonomy of independents grows in part from the view that competition at all levels of the distributive process is desirable and in part from the view that a manufacturer utilizing independent distributors and investing them with substantially all the risks of wholesale and retail distribution must also invest in them with the signal prerogative of the independent businessman, the power to set his own price." *Id.* at 656.

**IT IS THEREFORE ORDERED** that WMNI's motion for the issuance of a preliminary injunction is **DENIED.**

**SO ORDERED.**