**EAST BAY RUNNING STORE, INC.,
Plaintiff–Appellant,**

v.

**NIKE, INC., Defendant–Appellee.**

**No. 88–2011.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 30, 1988.

Decided Dec. 13, 1989.

Rehearing and Rehearing En Banc
Denied Jan. 25, 1990.

Thomas Molinaro, Brandy & Molinaro, Wausau, Wis., Scott W. Hansen (argued), R. Timothy Muth, Reinhart, Boerner, Van-deuren, Norris & Rieselbach, Milwaukee, Wis., for plaintiff-appellant.

Michael Bowen (argued), Foley & Lard-ner, Milwaukee, Wis., for defendant-appel-lee.

Before CUDAHY and KANNE, Circuit Judges, and WILL, Senior District Judge.[*]

KANNE, Circuit Judge.

In the appeal of this diversity action, we are asked to interpret the Wisconsin Fair Dealership Law, Wis.Stat. §§ 135.01 et seq. (WFDL). East Bay Running Store, Inc., a retailer of athletic shoes and associated apparel, commenced an action against NIKE, Inc. alleging a violation of §§ 135.03 and 135.04 of the WFDL. Specifically, East Bay claimed that NIKE's decision to prohibit the sale of NIKE AIR products by mail or telephone altered the terms of East Bay's dealership agreement with NIKE. NIKE moved for summary judgment claim-ing that the restriction did not substantially change the dealership agreement with East Bay and therefore was not, as a matter of law, within the scope of the WFDL's pro-tection. The district court agreed and granted NIKE's motion for summary judg-ment. East Bay appeals from that deci-sion. We affirm.

## I. FACTUAL BACKGROUND

East Bay Running Store, Inc., a Wiscon-sin corporation with its principal place of business in Wausau, Wisconsin, is engaged in the business of retail sales of athletic shoes and associated athletic apparel. In its store in Wausau, East Bay sells a wide variety of products from various manufac-turers of sporting apparel, including NIKE. Three methods of marketing athletic appar-el are utilized by East Bay: 1) face-to-face sales to customers that visit the Wausau store; 2) telephone and mail-order sales from East Bay's catalogs; and 3) direct solicitation to schools, sports clinics and other places. East Bay claims that its mail-order sales constitute the majority of its business.

NIKE, Inc., an Oregon corporation with its principal place of business in Beaverton, Oregon, is a supplier of athletic apparel to retailers throughout the United States. In 1983, NIKE introduced a new product line called "NIKE AIR." The distinguishing feature of this new product was the injec-tion of encapsulated, pressurized Freon gas into a sealed thermal plastic liner in the mid-sole of the athletic shoe. NIKE AIR is NIKE's top-of-the-line athletic shoe. As the popularity of NIKE AIR products

* The Honorable Hubert L. Will, Senior District Judge of the Northern District of Illinois, East-ern Division, is sitting by designation.

soared, this new feature was added to more of NIKE's athletic shoes.

In January of 1981, East Bay placed its initial order with NIKE.[1] Over the course of the next six years, NIKE was instrumental in the development of East Bay's flourishing mail-order business for NIKE products. Specifically, NIKE helped subsidize the printing costs of the mail-order catalogs. Further, NIKE approved the use of the NIKE trade name, trade marks and advertising personalities in East Bay's catalogs. To further promote its business in this regard, East Bay implemented several policies to ensure that its mail-order customers were pleased with the style and fit of their mail-order athletic shoes. The result of this combined effort is evident from the following figures. Fifty-five percent of East Bay's $7.8 million in total sales is derived from the sales of NIKE products. Moreover, between ninety and ninety-five percent of East Bay's business is associated with its mail-order sales operation. By 1987, sales of NIKE AIR products accounted for twenty-nine percent of East Bay's total sales and fifty-five percent of East Bay's NIKE sales.

On October 1, 1987, NIKE notified all of its dealers in the United States that NIKE AIR products would no longer be available to them for resale by mail, catalog, or electronic means.[2] NIKE's purpose in imposing the restriction was to prevent "free-riding" and to insure that the consumers of the NIKE AIR product line receive personal individualized attention.

East Bay commenced suit in the Circuit Court for Marathon County, Wisconsin. That court, on November 15, 1987, entered an *ex parte* restraining order precluding NIKE from terminating East Bay's supply of NIKE AIR products. NIKE subsequently removed the case to federal court under 28 U.S.C. § 1441(a) with diversity as its jurisdictional base. Once in federal court, East Bay claimed that the provisions of the WFDL prohibit the restriction on mail-order sales of NIKE AIR products. NIKE moved for summary judgment arguing that recovery was not available under § 135.03 of the WFDL in that the "no mail-order" restriction was not a substantial change in the competitive circumstances of their dealership agreement. In granting NIKE's motion for summary judgment, the district court relied on this court's decision in *Remus v. Amoco Oil Co.,* 794 F.2d 1238 (7th Cir.), *cert. dismissed,* 479 U.S. 925, 107 S.Ct. 333, 93 L.Ed.2d 345 (1986), and concluded that NIKE's non-discriminatory, system-wide indirect sales limitation did not "substantially change the competi-

1. There was no writing signed by both parties that purported to be a dealership or distributorship agreement between NIKE and East Bay. According to East Bay, however, the terms of their agreement are contained in two letters sent by NIKE dated January 5, 1981, and March 7, 1981. Regardless of this fact, the district court assumed that the WFDL applies to the relationship between these parties. We see no reason to disturb that assumption. *See* Wis. Stat.Ann. § 135.02(3); *Bush v. National School Studios, Inc.,* 139 Wis.2d 635, 407 N.W.2d 883 (1988); *Kealey Pharmacy & Home Care Services, Inc. v. Walgreen Co.,* 761 F.2d 345 (7th Cir.1985).

2. A letter dated August 26, 1987, from NIKE Director of Sales, Nick Kartalis, to the President of East Bay, Arthur Juede, stated:

> After careful and thoughtful consideration, NIKE, Inc. has decided to implement a newly formulated nationwide policy regarding sales to its customers operating Mail-Order Units. A Mail-Order Unit is one selling shoes through the mail, by catalog or through any electronic means, including computers, television or telephones.

> After November 30, 1987, no NIKE AIR shoes will be sold or made available to you for resale through your Mail-Order Unit, except for Future [sic] orders which were placed and confirmed on or before the date of this letter. A NIKE AIR shoe is one containing a midsole of pressurized gas encapsulated in a foam. Shoes containing removable sockliners with "air" units are not considered NIKE AIR shoes and are available for unrestricted resale.

> Of course, we will continue to supply you with NIKE AIR shoes for resale by your Retail Division.

> It has become increasingly apparent to us that pre-sale personal service is absolutely essential to the proper marketing and selling of the unique and technologically advanced NIKE AIR shoes. This objective can only be achieved by providing face-to-face attention and full-service support to walk-in customers. This new policy will apply to our other Mail-Order Units selling NIKE AIR shoes.

tive circumstances" of East Bay and, as such, did not implicate § 135.03 as it has been interpreted by the courts.

## II. ANALYSIS

Under § 135.03 of the Wisconsin Fair Dealership Law, "[n]o grantor . . . may terminate, cancel, fail to renew or *substantially change the competitive circumstances of a dealership agreement* without good cause." (emphasis added).[3] As a preliminary matter, it is important to note that this appeal is not about the termination, cancellation, or non-renewal of a dealership agreement. *Cf. Kealey Pharmacy & Home Care Services, Inc. v. Walgreen Co.*, 761 F.2d 345 (7th Cir.1985); *Ziegler Co., Inc. v. Rexnord, Inc.*, 147 Wis.2d 308, 433 N.W.2d 8 (1988); *Bresler's 33 Flavors Franchise Inc. v. Wokosin*, 591 F.Supp. 1533 (E.D.Wis.1984). Rather, the issue we must address is whether NIKE's actions in this case—instituting the policy that all NIKE dealers sell the NIKE AIR line of athletic apparel in a face-to-face manner—substantially changed the competitive circumstances of the dealership agreement such that the WFDL is implicated.

East Bay contends that the district court's conclusion that § 135.02 was not implicated in this case is based upon a misreading, and consequently, a misapplication of this circuit's decisions in *Kealey Pharmacy & Home Care Services, Inc. v.*

*Walgreen Co.* and *Remus v. Amoco Oil Co.*[4] Initially, East Bay maintains that NIKE's actions in this case did amount to a substantial change in the competitive circumstances of their dealership agreement. Based on this premise, East Bay asserts that the statutory framework of the WFDL requires that a grantor's unilateral decision which precipitates substantial changes in the competitive circumstances of a dealer be supported by good cause. East Bay proceeds to argue that good cause can only be established upon the grantor's showing that its action is not only non-discriminatory, but also "essential" and "reasonable." *See Zeigler Co., Inc. v. Rexnord, Inc.*, 147 Wis.2d 308, 319–20, 433 N.W.2d 8, 13 (1988). Relying on this construction of the WFDL, East Bay argues that the district court incorrectly focused on the "nondiscriminatory" requirement and failed to consider whether NIKE's actions were "essential" and "reasonable."

Under the plain language of § 135.03, the "good cause" requirement is not implicated without an initial finding that NIKE has terminated, cancelled, failed to renew, or substantially changed the competitive circumstances of the dealership agreement. As stated above, the issue in this appeal revolves around the latter concern. In that we agree with the district court that NIKE's actions in this case did not amount to a substantial change in the

---

3. The term "good cause" is defined as:
   (a) Failure by a dealer to comply substantially with essential and reasonable requirements imposed upon him by the grantor, or sought to be imposed by the grantor, which requirements are not discriminatory as compared with requirements imposed on other similarly situated dealers either by their terms or in their manner of enforcement; or
   (b) Bad faith by the dealer in carrying out the terms of the dealership.
   Wis.Stat.Ann. § 135.02(4).

4. We reject East Bay's assertion that *Kealey Pharmacy* governs this case. As a "dealership termination" case, our decision in *Kealey Pharmacy* is clearly distinguishable from the case at bar. Moreover, our decision in that case was premised upon a type of overreaching by Walgreen, the grantor, that is not present under these facts. Briefly, in *Kealey Pharmacy*, Walgreen terminated all of its Wisconsin dealership

agreements with the avowed purpose of supplementing the number of its own stores in that marketing area. In so doing, Walgreen was attempting to appropriate to its own stores the goodwill in Walgreen products that had been generated by the several independently owned pharmacies whose dealerships it was terminating. We held that the "good cause" requirement in § 135.02 does not permit blanket terminations such as this where the grantor intends to increase the number of its own stores in the same marketing area. Under the facts presented, there is no evidence that NIKE's systematic change was geared towards running East Bay and other dealers out of the market so as to appropriate the business that would thereby be left behind. Rather, it seems clear, as the district court noted, that NIKE's sole motivating factor in this regard was to more effectively market its NIKE AIR line by mandating individual, personalized attention in all sales. As such, our decision in *Kealey Pharmacy* is inapposite.

competitive circumstances of the dealership agreement, we need not address the application of the "good cause" requirement.

■ We reject East Bay's contention that NIKE's new policy constitutes a substantial change in the dealership agreement merely because it may affect East Bay's profitability. Even though a new policy may hurt the profitability of some dealers, the prohibition of substantial changes in competitive circumstances was not meant to prohibit nondiscriminatory system-wide changes. *Remus*, 794 F.2d at 1240. In *Remus*, a gasoline dealer alleged that Amoco Oil Company had violated the WFDL by adopting a "discount for cash" policy which was applied across the board to all Amoco dealers.[5] In that most of plaintiff's sales were credit sales, he was not in favor of establishing the credit card discount program and complained that Amoco's unilateral action constituted a substantial change in the competitive circumstances of his dealership agreement. The district court rejected the claim and awarded summary judgment to Amoco. On appeal, we affirmed and held that a non-discriminatory, system-wide policy adopted by the grantor of a dealership is not a substantial change in competitive circumstances. In so doing, we noted that an interpretation of the WFDL that allowed dealers to bring suit for system-wide non-discriminatory changes:

> would ... completely transform the relationship of a franchisor and franchisee— much as a law which said that a company

could not alter its prices or products without its employees' consent would completely transform the employment relationship ... [and] would not serve the interest of the franchisees as a whole.

794 F.2d at 1241. The situation presented to the court today is not substantially different from that which we addressed in *Remus*. NIKE has implemented a policy that applies not only to East Bay, but to all retailers of NIKE AIR products nationwide. Moreover, the implementation of this policy does not appear to be an underhanded attempt on the part of NIKE to drive any individual dealer out of business and thereby usurp the good will which that dealer had generated in NIKE AIR products. On the contrary, it is apparent that NIKE's motivation was simply to ensure the satisfaction of its customers who purchase the NIKE AIR products. As in *Remus*, we hesitate to conclude that the Wisconsin legislature meant to preclude this type of business decision through its passage of the WFDL.[6]

In *St. Joseph Equip. v. Massey–Ferguson, Inc.*, 546 F.Supp. 1245 (W.D.Wis.1982), a federal district court sitting in diversity stated that the prohibitions of § 135.03 are not applicable in cases where the grantor undertakes a non-discriminatory withdrawal from a product market on a large geographical scale, i.e. withdrawal from the construction equipment market in North America. The court observed that "where the problem or the motivation for the grantor to act is larger than a question

---

**5.** Under this policy, Amoco reduced its wholesale gasoline prices to all of its dealers, while at the same time reducing the amount that it reimbursed dealers for credit card sales. The effect of this policy was to facilitate sales by dealers that offered discounts to customers paying in cash as opposed to credit cards.

**6.** Although not relevant to our decision today, we note briefly that our discussion of the "good cause" requirement in *Remus v. Amoco Oil Co.* is at odds with the Wisconsin Supreme Court's interpretation of § 135.02(4) in *Ziegler Co., Inc. v. Rexnord, Inc.*, 147 Wis.2d at 316–20, 433 N.E.2d at 12–13 (1988), ("The requirements sought to be imposed by the grantor must be essential, reasonable and nondiscriminatory"). While *Ziegler* is distinguishable in that it is a "failure to renew" case, East Bay's contention

that the "good cause" requirement of § 135.02(4) requires the *grantor* to show that his action is "essential" and "reasonable" appears to be supported by the Wisconsin Supreme Court. *But see Ziegler*, (Abrahamson, J., concurring).

We also noted in *Remus* that the provision about not "substantially chang[ing] the competitive circumstances of the dealership" may be meant to protect the dealer against "constructive termination." 794 F.2d at 1240. East Bay, however, does not attempt to show that NIKE's actions amounted to a "constructive termination." As the district court below pointed out, the wisdom of this tactic is proven ... by the uncontested facts that plaintiff retains the right to sell Nike Air products ... and also retains the right to sell ... other Nike products, in any manner it desires."

simply of the performance of a particular dealer, the WFDL's underlying purposes must govern." *Id.* at 1248.[7] As was noted by the court in *St. Joseph,* it would hardly be consistent with the purposes of the WFDL to permit individual dealerships, such as East Bay, to preempt the effective implementation of a non-discriminatory business decision such as the policy put forth by NIKE. Based on our own precedent, and in light of this persuasive reasoning, we conclude that NIKE's withdrawal of only a method of marketing the NIKE AIR product line was not a substantial change in the competitive circumstances of the dealership agreement and, as such, § 135.03 is not implicated. *Cf. Van v. Mobil Oil Co.,* 515 F.Supp. 487, 490 (E.D.Wis. 1981).

The record shows, and East Bay does not dispute, that NIKE implemented the policy with respect to all of its retailers in the United States on an across-the-board, system-wide, non-discriminatory fashion. East Bay has not been terminated as a source of NIKE products, nor has it been deprived of the right to sell any line of NIKE products—including NIKE AIR. The policy implemented by NIKE simply mandates that NIKE AIR products may no longer be marketed by any means that preclude personal, individualized attention to the customer. East Bay, like all other NIKE dealers nationwide, is still encouraged to market NIKE AIR products through retail sales and direct solicitation to schools and athletic clinics. Finally, it is apparent that the policy is not a ploy by NIKE to appropriate the good will established by East Bay in marketing the NIKE AIR products in this region.

Based on the non-discriminatory nature of NIKE's "no mail-order" policy, we hold that the requirement of good cause was not triggered in this case. Specifically, we conclude that there was no termination, non-renewal or cancellation of a dealership agreement; nor was there any substantial change in the competitive circumstances amounting to *de facto* or constructive termination of the dealership agreement. Simply put, NIKE's implementation of its "no mail-order" policy does not implicate § 135.03 under these circumstances.

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment.

---

7. Section 135.025(2) provides:

The underlying purposes and policies of this chapter are:

(a) To promote the compelling interest of the public in fair business relations between dealers and grantors, in the continuation of dealerships on a fair basis;

(b) To protect dealers against unfair treatment by grantors, who inherently have superior economic power and superior bargaining power in the negotiation of dealerships;

(c) To provide dealers with rights and remedies in addition to those existing by contract or common law;

(d) To govern all dealerships, including any renewals or amendments, to the full extent consistent with the constitutions of this state and the United States.