**WISCONSIN MUSIC NETWORK, INC., Plaintiff–Appellant,**

v.

**MUZAK LIMITED PARTNERSHIP, Defendant–Appellee.**

No. 93–1039.

United States Court of Appeals, Seventh Circuit.

Argued May 10, 1993.

Decided Sept. 14, 1993.

**220**

Stuart Parsons (argued), James P. Brennan, Quarles & Brady, Milwaukee, WI, for plaintiff-appellant.

Andrew O. Riteris, Joshua L. Gimbel, Michael, Best & Friedrich, Milwaukee, WI, George E. Greer (argued), Heller, Ehrman, White & McAuliffe, Seattle, WA, for defendant-appellee.

Before POSNER and FLAUM, Circuit Judges, and WILL, Senior District Judge.[*]

FLAUM, Circuit Judge.

Wisconsin Music Network, Inc. (WMNI) sued Muzak Limited Partnership for federal antitrust violations and a violation of the Wisconsin Fair Dealership Law (WFDL). After an evidentiary hearing, the district court denied WMNI's motion for a preliminary injunction, 822 F.Supp. 1332, and WMNI appeals. We affirm.

### I.

Muzak formats and sells a service called subscription programmed music, operating through 14 owned operations and 160 franchises. Each operation or franchise distributes the Muzak service in an exclusive territory. WMNI has been the only Muzak licensee (or franchisee or affiliate[1]) in the Milwaukee area for almost fifty years. The franchisees sell the Muzak program within their territories, and also install and service the equipment needed to receive and distribute the product. They pay Muzak a ten-

percent royalty on the sale of the music program. Muzak's biggest competitors are AEI, 3M, and the radio. 3M and AEI do not operate through franchisees; the two companies are vertically integrated, operating through a network of company-owned distributorships.

The 1980 License Agreement between Muzak and WMNI expired by its terms on March 31, 1989, while Muzak was drafting a new system-wide franchise contract with the International Planned Music Association ("IPMA"), an association of Muzak affiliates. According to the 1980 agreement, Muzak was required to offer WMNI a new license agreement under the same terms as the agreement offered to similarly-situated licensees. In light of the ongoing negotiations, the parties agreed to operate on a month-to-month basis, according to the terms of their last contract, until the new agreement had been hammered out.

The most significant and only relevant change in the 1991 License Agreement is the inclusion of the Multi–Territory Accounts ("MTA") Program. The MTA program is a national marketing plan created to enable Muzak to compete for national accounts with 3M and AEI, the other two biggest providers of subscription programmed music. Under the MTA program, national customers with more than fifty outlets located in at least four different Muzak affiliates' territories can negotiate a single contract with one representative of Muzak for uniform music service and standard rates for their outlets across the country. An eligible customer can be placed on the MTA list after the franchisee in whose territory the customer is headquartered consents in writing. Then an "assigned person" is designated to conduct the negotiations for a multi-territory contract, with the customer's headquarters and the MTA committee. The MTA committee consists of six members, three chosen by IPMA and three chosen by Muzak.[2] The franchisee in whose territory the headquarters is located decides

---

[*] The Honorable Hubert L. Will of the Northern District of Illinois, sitting by designation.

1. The parties use the terms interchangeably.

2. The IPMA appointees are franchisees. Muzak appoints two of its employees and one franchi-

see. The MTA Committee meets at least quarterly and adopts guidelines, including general pricing guidelines, for Multi–Territory Contracts. These guidelines bind both Muzak and all participating affiliates. Ex. G § 3.

whether it or Muzak itself will be the assigned person.

The placement of a business on the MTA list is not binding on the customer outlets; any customer may contact the local Muzak franchisee instead of negotiating with the assigned person. After a contract for system-wide service is executed by an MTA customer, each franchisee may choose whether to provide service under the contract to the national customer's outlets located in its territory. If a franchisee chooses to provide service, it must do so according to the terms and conditions set forth in the MTA contract. If the franchisee decides not to provide service, the neighboring franchisee may provide the service.

In September of 1990, the new license agreement received unanimous approval from the Board of the IPMA. The Wisconsin Department of Securities also approved the agreement on January 15, 1991. When Muzak first offered its new contract to WMNI on January 31, 1991, WMNI balked at many of its terms, including the MTA program.[3] The same agreement was offered to every other similarly-situated Muzak franchisee, i.e., those whose previous contracts had expired; all but one other signed. Muzak and WMNI negotiated for over a year, but they could not reach a satisfactory agreement. On June 23, 1992, Muzak sent WMNI a letter demanding signature on the new agreement within sixty days or it would terminate their relationship at the end of ninety days. In response, WMNI filed this action in Wisconsin Circuit Court and Muzak removed to federal court. Eight days later, WMNI sought a preliminary injunction to prevent the termination of its Muzak license.

The district court held an evidentiary hearing on October 28, 1992. It also considered pre-hearing and post-hearing briefs and exhibits submitted by the parties. In its opinion, the court found that Muzak had not violated the WFDL by failing to renew WMNI as a licensee because WMNI had refused to comply with new requirements which were essential, reasonable, and non-discriminatory. It also determined that the new Muzak license agreement did not violate the federal antitrust laws. Because it found that WMNI had not demonstrated any likelihood of success on the merits, the district court denied WMNI's motion for a preliminary injunction.[4]

## II.

■ We review a district court's denial of a preliminary injunction for an abuse of discretion. More specifically, we review factual determinations for clear error and legal conclusions *de novo*, but the "ultimate evaluation ... is a highly discretionary decision ... to which [we] give substantial deference." *Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1437 (7th Cir.1986). "The question for us is whether the judge exceeded the bounds of permissible choice in the circumstances, not what we would have done if we had been in his shoes." *Roland Machinery Co. v. Dresser Indus.*, 749 F.2d 380, 390 (7th Cir.1984). The movant must show 1) a reasonable likelihood of success on the merits; 2) the inadequacy of a remedy at law; and 3) the existence of irreparable harm without the injunction, as a threshold burden. If the movant can demonstrate these three elements, the court weighs the relative harms to the parties and the probability of the movant's success on the merits. *Kellas v. Lane*, 923 F.2d 492, 493 (7th Cir.1990). "If it is plain that the party seeking the preliminary injunction has no case on the merits, the injunction should be refused regardless of the balance of harms." *Green River Bottling Co. v. Green River Corp.*, 997 F.2d 359, 361 (7th Cir.1993).

### A. The MTA Program and Federal Antitrust Laws.

■ Section 1 of the Sherman Act prohibits "[e]very contract, combination, ..., or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Section 3 of the Clayton Act specifically prohibits price-fixing to the detriment of competition. 15 U.S.C. § 14. WMNI argues that Muzak's inclusion

---

3. On appeal, WMNI challenges the new agreement only because of the MTA program.

4. Muzak has agreed to maintain the franchise contract until this appeal has been decided.

**222**

of the MTA program in its license agreements should be analyzed as a *per se* antitrust violation. As the Supreme Court held in *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49–50, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977), *"[p]er se* rules of illegality are appropriate only when they relate to conduct that is manifestly anticompetitive." According to the rule of reason, the "prevailing standard of analysis," the factfinder must determine from all of the circumstances of a case whether a practice unreasonably restrains competition. *Id.; see also Business Electronics v. Sharp Electronics*, 485 U.S. 717, 723, 108 S.Ct. 1515, 1519, 99 L.Ed.2d 808 (1988) ("Since the earliest decisions of this Court interpreting [section 1 of the Sherman Act], we have recognized that it was intended to prohibit only unreasonable restraints of trade."). Vertically-imposed, fixed resale prices, however, remain a *per se* violation. *Id.*

■ The district court employed the appropriate analysis under the rule of reason because the MTA program does not impose fixed resale prices. The evidence demonstrated that MTA contract prices vary among national customers and that the prices are determined through negotiations among the customer, Muzak representatives, and several franchisees, including the assigned person and MTA committee members. The program is not manifestly anti-competitive. In fact, after examining the program and its effect on the market, the district court concluded that the MTA program enhances competition by increasing the available choices for music service customers.

■ WMNI's problem with the MTA program lies in the restriction on the contractual terms, particularly the price term, it must offer to an MTA-listed customer who has chosen to negotiate with the assigned person for all of its outlets. While the local outlet of the MTA national customer may opt to abide

by the national terms or to negotiate with the local franchisee, the Muzak franchisee must either abide by the MTA contract in dealing with the local outlet or give up that customer. In other words, the franchisee may not independently approach a local outlet which has chosen to use the national contract, in order to negotiate different terms. Muzak Multi-Territory Accounts Program, Ex. G § 2.[5] WMNI claims that Muzak's insistence on franchisee acceptance of the MTA program violates the antitrust laws by requiring the franchisees to follow the national contract terms, including the price term, or to give up the local outlet to a neighboring franchise which is willing to provide the service according to the national terms. WMNI competes primarily with the 3M and AEI distributors in its territory. In order to compete effectively, it negotiates with customers over price terms, quality and dependability of its service, and responsiveness to its customers. Under the MTA program, WMNI claims that it will lose price flexibility with respect to one-third of its accounts. The national contract fixes a price term, which binds the franchisee who chooses to provide service to the local outlet of the MTA customer. The net effect, according to WMNI, is that it will lose national business.[6]

Under *Ohio–Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 585 F.2d 821, 836–38 (7th Cir. 1978), Muzak may offer a single price to all locations of a national chain through a national accounts program, as WMNI conceded at argument. If Muzak allowed each franchisee to offer varied terms to local outlets, the system-wide contract would disintegrate. Muzak must be permitted to take the minimum steps necessary to keep its national program viable. *See Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 708 (7th Cir.1984). Local compliance with the national contract is needed in order to assure the national customer that the single-point

---

**5.** We note, however, that with the prior written consent of the "assigned person," the local franchisee can approach the outlet located in its territory. Ex. G § 2.1. Muzak offered evidence that in fact local marketing to MTA-listed outlets does occur, particularly before the national contract is finalized. Defendant's Supp.App., Tab 18 at 74–75.

**6.** WMNI offers no response to Muzak's contention that, without offering a national program, Muzak and thus all of its franchisees will lose the business of national customers who prefer national contracts to 3M and AEI.

negotiations have any real value. Muzak requires each affiliate to abide by the terms of the program, although it may decline to participate in any or all MTA contracts. Without the assent of each franchisee to accept and follow the MTA program according to the new license agreement, Muzak will not be able to offer national customers the efficiency and benefits of a single contract.

WMNI argues that, because Muzak operates through franchisees that make the investment in equipment, incur the costs of local servicing, and pay Muzak a royalty fee, it must allow franchisees the freedom to negotiate over price with any potential customer. Meanwhile, 3M and AEI can offer national customers a single-price national contract because they operate through distributors. WMNI's argument that Muzak must make the local investment itself if it wants to compete for single-negotiation national contract business would encourage Muzak's vertical integration—a less desirable result for WMNI than the restrictions inherent to the MTA program. *See Business Electronics,* 485 U.S. at 725, 108 S.Ct. at 1520 (making all vertical restraints illegal *per se* "would create a perverse incentive for manufacturers to integrate vertically into distribution, an outcome hardly conducive to fostering the creation and maintenance of small businesses"). Muzak's response to the need for a national program merely restricts the freedom of its franchisees to approach independently every local outlet of a national MTA customer, not as drastic a course of action as the one WMNI suggests. If Muzak decided to implement a national program according to WMNI's terms, it would eliminate franchisees and distribute its service directly.

Muzak made a substantial and persuasive showing at the injunction hearing that, without the MTA program or its equivalent, it could not effectively compete with the other subscription programmed music service companies like 3M and AEI for the business of national companies. Muzak contends, and the district court found, that the MTA program increases interbrand competition "by allowing Muzak and its affiliates to offer national treatment. The result is that in-

stead of two competitors offering national programs, there are now three." District Court Op. at 1341; *see Business Electronics,* 485 U.S. at 726, 108 S.Ct. at 1521 ("interbrand competition is the primary concern of the antitrust laws").[7] The MTA program allows Muzak to offer national customers a single contract, instead of separate contracts with each outlet located in a different franchisee's territory. The single contract offers the customer the benefits of a consistent music format, centralized billing, standardized rates, efficiently executed negotiations, and other economies of scale. Neither Muzak nor the MTA committee sets a uniform price term for all MTA contracts. The prices are negotiated with MTA customers within general pricing guidelines. An assigned person who cannot make a sale to an MTA customer because of competition from 3M or AEI or for any reason may return to the MTA committee for authority to offer a price below the guideline range or to offer more attractive terms and conditions to the customer. Muzak has offered evidence that in fact franchisees obtained this approval from the committee in the past. Defendant's Supp.App., Tab 18 at 26; Tab 17 at 21.

"Competition is the allocation of resources in which economic welfare (consumer welfare, to oversimplify slightly) is maximized; it is not rivalry per se, or a particular form of rivalry, or some minimum number of competitors." *Roland Machinery,* 749 F.2d at 395. Muzak's MTA program prevents WMNI from offering terms different from the negotiated national contract terms to a local outlet of an MTA-listed national customer, unless the local outlet approaches WMNI or WMNI receives written consent from the assigned person. The effect of the program increases consumer choice and interbrand competition among national programmed subscription music service providers. WMNI presented no evidence that the program would reduce the market for music service or increase prices. The district court correctly found that the program does not unreasonably restrain competition and that WMNI had not demonstrated any likelihood of success on the merits.

**7.** WMNI concedes that the program is "neutral" as to intrabrand competition.

B. The MTA Program and the WFDL.

Under Wisconsin's Fair Dealership Law, a grantor or licensor may refuse to renew a dealership contract or license for "good cause." Wis.Stat. § 135.03. "Good cause" includes a dealer's failure to comply with "essential and reasonable requirements imposed upon him by the grantor," as long as the same requirements are imposed on "similarly situated dealers." *Id.* § 135.02(4). The determination of good cause must be made on a case-by-case basis. *Ziegler Co., Inc. v. Rexnord, Inc.*, 147 Wis.2d 308, 433 N.W.2d 8, 13 (1988). The district court found that the new terms of the license agreement were essential and reasonable because they enabled Muzak to offer a national service. The MTA program met a competitive need to offer national customers national treatment. Muzak demonstrated the customer demand and the court was persuaded that Muzak and its franchisees would lose national business without the MTA program. In addition, the district court found that Muzak sought to impose the same terms in every new license agreement with similarly situated franchisees.

WMNI did not offer evidence which undermined Muzak's argument that the MTA program was essential and reasonable in light of consumer demand. The fact that Muzak has not unilaterally imposed the MTA program on franchisees operating under unexpired contracts simply does not support WMNI's argument that the program is nonessential. It is not unreasonable for Muzak to rewrite its license agreements in an orderly fashion, incorporating new terms as the agreements require renewal. All franchisees with expired agreements have been offered the agreement containing the MTA program terms; eventually all Muzak affiliates will execute the new contract. Moreover, WMNI offered no evidence of customers or profits it will lose as a result of the MTA program.

As WMNI argues, a court must consider the effects of the new terms on the grantee. *Id.* 433 N.W.2d at 12. However, as we have previously noted in reviewing this Wisconsin statute, "[w]e hesitate to conclude that the Wisconsin legislature meant ... to prevent franchisors from instituting non-discriminatory system-wide changes without the unanimous consent of the franchisees." *Remus v. Amoco Oil Co.*, 794 F.2d 1238, 1241 (7th Cir.1986). The district court found Muzak's evidence of its economic necessity persuasive, and it found WMNI's responsive arguments weak. After considering the effect of the program on Muzak, its affiliates, and music service customers, the court resolved in Muzak's favor the antitrust violation argument pressed by WMNI to support its state law violation claim. Again, the district court's conclusions and judgment were not an abuse of discretion.

The judgment of the district court is AFFIRMED.