In the
United States Court of Appeals
For the Seventh Circuit

No. 00-4212

Re/Max North Central, Inc.,

Plaintiff-Appellee,

v.

Patricia Cook, f/d/b/a Re/Max Lake and Country,

Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 00-C-1314--John W. Reynolds, Judge.

Argued May 16, 2001--Decided November 13, 2001

   Before Harlington Wood, Jr., Coffey, and
Williams, Circuit Judges.

   Coffey, Circuit Judge.  On May 1, 1993,
Re/Max North Central, Inc. entered into a
franchise agreement with Patricia Cook,
granting her the exclusive right to
operate a Re/Max real estate office
within a defined area that included
Mukwonago, Wisconsin. When the 1993
agreement expired in 1998, the parties
negotiated the terms of a successor
agreement. Cook, however, never signed
the successor agreement because she
continued to object to its terms. After
Re/Max made several attempts at
reconciliation in hopes of solving the
problem, it terminated her franchise
rights on August 11, 2000. In spite of
the termination Cook continued to use
Re/Max's marks and logos, and Re/Max
consequently sought and received a
preliminary injunction in the United
States District Court for the Eastern
District of Wisconsin prohibiting Cook
from continuing to use its trademarks and
logos. Cook appeals the district court's
imposition of the preliminary injunction,
arguing that Re/Max failed to comply with
the Wisconsin Fair Dealership Law when it
terminated her franchise rights. We
affirm.

I.  Factual Background

On May 1, 1993, Cook entered into a franchise agreement with Re/Max to operate an exclusive Re/Max franchise in the Mukwonago-East Troy area of southeastern Wisconsin. The 1993 agreement was for an initial term of five years and provided Cook with the opportunity to renew the agreement for two additional five-year terms, provided that, among other things, Cook gave Re/Max written notice of her intent to renew not less than six (6) months prior to the end of the agreement and further that she was not in default under the terms of the 1993 agreement. Section 6.C of the 1993 agreement further provided that if Cook chose to renew her franchise rights beyond the initial period, she was required to do so under the terms of the franchise agreement being used at the time of her renewal.

In compliance therewith, Cook provided Re/Max with both a verbal and written notice of her intent to renew her franchise rights in August 1997. Re/Max did not immediately advise Cook that renewal would be forthcoming, but on April 10, 1998, Re/Max provided Cook with a copy of the 1998 Re/Max Franchise Offering Circular. Shortly after receiving the 1998 circular, Cook tendered to Re/Max a check in the amount of $8,500, twice the amount required to renew her franchise agreement. On May 1, 1998, Re/Max responded with a letter to Cook expressing its concerns about the renewal of Cook's subfranchise rights due to her failure to meet the sales associate quota required in the 1993 agreement. Under the 1993 agreement Cook had been required to retain a minimum of five (5) sales associates in her office by May 1996. Cook, however, was the only sales associate operating out of that location throughout the term of the 1993 agreement. Despite these concerns, Re/Max nevertheless offered to extend the term of the 1993 agreement for six months in order that it might ascertain whether Cook was willing and able to comply with the sales associate quota.

On November 25, 1998, Re/Max issued Cook a notice of default because she had failed to hire the requisite number of sales associates (5) under the 1993 agreement. In the notice of default, Re/Max expressed its intention not to re new her agreement unless she cured her

default by expanding her office and hiring the requisite number of sales associates before January 26, 1999. In order that she might comply with the sales associate quota, Cook hired several family members,/1 though none of them had ever been a member of the Milwaukee Metro Multiple Listing Service./2 Despite Cook's questionable hires, Re/Max accepted her identification of the sales associates and began the renewal process. Because Re/Max had not yet completed its 1999 franchise offering circular,/3 it allowed Cook to operate her franchise on a month-to-month basis under the terms of the 1993 franchise agreement until Re/Max had completed the 1999 circular.

In April 1999, Re/Max registered its 1999 franchise offering circular with the State of Wisconsin and provided Cook with a copy to review and thereafter in June forwarded a copy of the proposed 1999 franchise agreement to her for execution. Cook was not interested in signing the agreement at this time as she was in hopes of negotiating the terms of the agreement, particularly the term dealing with the number of sales associates she was required to employ in her office. Re/Max desired that Cook retain at least five (5), if not more, sales associates in her sales office, while Cook wished to retain only two (2). Re/Max acceded to Cook's wish and engaged in lengthy negotiations with Cook and her counsel about the terms of the 1999 agreement, focusing almost exclusively on terms related to the sales associate quota. In September 1999 Cook and Re/Max ultimately agreed that the sales associate quota would remain at five (5).

Shortly after Re/Max and Cook concluded their negotiations, Re/Max provided Cook with copies of the 1999 franchise agreement for her to execute. By November 8, 1999, more than six weeks after the 1999 agreement had been forwarded to Cook, Cook still had not signed it. Re/Max inquired of Cook in writing, asking her if her delay in signing the franchise renewal agreement meant that she did not wish to renew her franchise rights. Cook responded to Re/Max's inquiry by returning the 1999 agreement on or about November 17, 1999. But instead of executing the negotiated 1999 agreement forwarded to her, Cook unilaterally altered the term dealing with the required number of sales

associates. Even though the parties had previously agreed that the agreement would require Cook to employ five (5) sales associates, Cook instead suggested that she only be required to retain two, a suggestion that Re/Max had previously rejected during negotiations. Re/Max declined to accept Cook's proposed changes, and informed her that, unless she executed the 1999 agreement by December 20, 1999, as the parties had negotiated it, it would be forced to conclude that she was not interested in renewing her franchise.

On January 26, 2000, still awaiting a response from Cook, Re/Max placed Cook's franchise agreement in default, provided her with 90 days notice of termination. The notice of termination gave Cook a 60-day period, beginning on January 26, 2000, within which to cure the default by completing the renewal requirements. In the letter, Re/Max explained that the 1999 agreement expired on March 14, 2000 and would be replaced with the 2000 agreement. Re/Max provided Cook with two options to cure her default--renew her franchise rights under the 1999 agreement by signing and returning it before March 14 or renew her franchise rights under the 2000 agreement if she chose to do so after March 14.

Cook did not sign and return the 1999 agreement by March 14, 2000. Accordingly, on March 20 Re/Max sent Cook a copy of the 2000 Uniform Offering Circular by overnight mail and also extended the time within which Cook could cure her default with the signing of the 2000 agreement, in order to provide Cook the legally mandated time to review the offering. But instead of later signing the 2000 agreement, as instructed in both Re/Max's January 26 and March 20 correspondence, Cook signed the expired 1999 agreement and returned it to Re/Max on March 27, 2000.

Re/Max did not countersign the outdated 1999 agreement because that agreement was no longer registered in Wisconsin, having been replaced by the 2000 agreement. Re/Max informed Cook that it could not sign the 1999 agreement because it was no longer registered, but once more provided Cook with additional time to sign the 2000 agreement. Cook again refused to sign the 2000 agreement, without offering

an accompanying explanation. Despite Cook's obstinance, Re/Max attempted to continue negotiations with Cook and offered her the option of signing the 1999 agreement with an accompanying release agreeing not to sue Re/Max for allowing her to renew her franchise rights under an expired agreement. Cook refused, and once again refused to sign the 2000 agreement, though she never did express any reason for her refusal. On July 5, 2000, Re/Max again extended Cook's time to cure the default and established a final cure date of July 10, 2000 and notified Cook that her franchise rights would be terminated effective August 11, 2000 if she had not renewed her franchise rights by executing an effective agreement by July 10. Re/Max offered Cook the choice between executing the 2000 agreement or the 1999 agreement accompanied by a waiver releasing Re/Max from liability for allowing Cook to execute an expired agreement. Cook failed to cure her default, and Re/Max terminated her franchise rights on August 11, 2000.

Despite having refused to sign a franchise agreement as well as refusing to honor the termination of her franchise rights on August 11, Cook took it upon herself to continue to use the Re/Max marks and continued to hold herself out as a licensed provider of Re/Max real estate services even after she had received notice that her right to engage in the real estate business under the Re/Max name had been terminated. Re/Max at that time filed this suit seeking an injunction against Cook for trademark infringement under the Lanham Act, 15 U.S.C. sec. 1065. In the district court, Cook argued that Re/Max had terminated her franchise rights in violation of the Wisconsin Fair Dealership Law ("WFDL"), Wis. Stats. sec.sec. 135.01 et seq., because it had not given her 60 days to cure her default. According to Cook, Re/Max's requirement that she sign the 1999 agreement before March 14 gave her only 48 days to cure her default and that she should be given an additional 60 days from March 14 to sign the 2000 agreement. Cook reasoned that she should be given an additional 60 days to sign the 2000 agreement because the 2000 agreement contained a new term that was not acceptable to her. Cook observed that the 1999 agreement had granted her the

exclusive right to operate a Re/Max franchise in her protected territory and thus prohibited Re/Max from granting any other franchise in that territory. The 2000 agreement, however, allowed Re/Max to issue a commercial-only franchise to other potential franchisees within her protected territory.

Re/Max responded that it had given her 60 days to sign a then-existing agreement, noting that both the 1999 agreement expired after March 14. Re/Max argued that during the negotiations that proceeded between April 2000 and July 2000, Cook never once informed it that she objected to the term allowing Re/Max to issue commercial-only franchises. Re/Max also pointed out that since 1993 Cook had only two commercial listings, and therefore the 2000 agreement did not substantially change Cook's competitive circumstances.

The district court rejected Cook's WFDL argument and found that Re/Max had given Cook the required 60 days to cure her default. Thereafter, the judge ruled that since Cook had refused to execute a franchise agreement within the time frame allowed, Re/Max's action in terminating her franchise rights was proper. Furthermore, the judge ruled that he was convinced that Re/Max could demonstrate a likelihood of success on the merits on its Lanham Act claim that Cook's continued use of Re/Max's marks and logos infringed upon Re/Max's trademark rights. The court further determined that Re/Max would suffer irreparable injury for which it had no adequate legal remedy if theinjunction were not granted. Finally, the court ruled that Cook had failed to establish that she would suffer any irreparable harm if the injunction were granted. Accordingly, the court granted Re/Max's motion for a preliminary injunction.

II. Issues

Cook raises three issues on appeal. First, she challenges the district court's determination that Re/Max is likely to prevail on the merits, renewing the WFDL argument that she raised below. Second, Cook argues that the district court erred in its conclusion that Re/Max would suffer irreparable harm if the injunction were not granted. Finally,

Cook contends that the district court improperly weighed the relative harm to Cook in granting the injunction.

III.  Analysis

We review a decision denying or granting a preliminary injunction under the abuse of discretion standard. Wisconsin Music Network, Inc. v. Muzak Limited Partnership, 5 F.3d 218, 221 (7th Cir. 1993). We give "'substantial deference to a district court's decision to grant a preliminary injunction insofar as that decision involves the discretionary acts of weighing evidence or balancing equitable factors.'" Gateway Eastern Rwy Co. v. Terminal R.R. Assoc. of St. Louis, 35 F.3d 1134, 1137 (7th Cir. 1994) (quoting United States v. Baxter Healthcare Corp., 901 F.2d 1401, 1407 (7th Cir. 1990)). "'The question for us is whether the judge exceeded the bounds of permissible choice in the circumstances, not what we would have done if we had been in his shoes.'" Wisconsin Music Network, Inc., 5 F.3d at 221 (quoting Roland Machinery Co. v . Dresser Indus., 749 F.2d 380, 390 (7th Cir. 1984)).

Before a court will grant a preliminary injunction, the movant must demonstrate a likelihood of success on the merits, the existence of an irreparable harm without the injunction, and an inadequate remedy at law. Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc., 128 F.3d 1111, 1114 (7th Cir. 1997); Gateway Eastern Rwy Co., 35 F.3d at 1137; Wisconsin Music Network, Inc., 5 F.3d at 221. If the moving party meets this threshold burden, then the court weighs the relative harms to the respective parties and the probability of the movant's success on the merits. Gateway Eastern Rwy Co., 35 F.3d at 1137; Wisconsin Music Network, Inc., 5 F.3d at 221.

A.  Likelihood of Success on the Merits

In its complaint in the district court, Re/Max alleged that Cook continued to use its marks after Re/Max had terminated her franchise rights, in violation of the Lanham Act, 15 U.S.C. sec. 1065. Cook does not dispute that she continued to use Re/Max's marks, but argues instead that Re/Max was not likely to prevail on the merits because Re/Max had never

properly terminated her franchise rights, relying primarily on various portions of the Wisconsin Fair Dealership Law (WFDL). Wis. Stats. sec.sec. 135.01 et seq.

Cook rests her initial argument upon the notice and cure provision of the WFDL, which required Re/Max to provide Cook with written notice of default 90 days prior to terminating her franchise agreements and also allow Cook 60 days to cure any default. Wis. Stats. sec. 135.04. Cook contends that Re/Max failed to comply with the notice and cure provision of the WFDL because Re/Max's January 26 notice required her to sign the 2000 agreement (instead of the expired 1999 agreement) after March 14 and provided her with only 48 days within which to cure her default. Cook's argument mistakenly assumes that the default was her failure to execute the 1999 agreement. The January 26 notice, however, clearly explains that Cook's default is her "failure to complete a proper renewal of [her] Re/Max franchise," not that Cook has failed to execute the 1999 agreement.

Re/Max gave Cook 60 days to cure her default by executing a valid franchise agreement. It allowed her to sign the 1999 agreement anytime during the 48 days during which it was in effect or it allowed her thereafter to sign the 2000 agreement once it became effective. Furthermore, even after the 60-day period had elapsed, Re/Max extended Cook's cure period until July 10, 2000 and did not finally terminate her franchise rights until August 11, 2000. Re/Max gave Cook much more than the required 60 days, 167 to be precise, to cure her default by signing an agreement registered with Wisconsin, and she steadfastly refused to do so.

Cook argues that the WFDL required Re/Max to issue separate cure and default notices for both the 1999 and the 2000 agreement. She cites no precedent in support of this argument and instead offers only weak and unconvincing excuses for her failure to sign an existing agreement during the period Re/Max provided her to cure her default. For instance, Cook makes much of the fact that her 1993 agreement expired in early 1999 and she didn't receive copies of the 1999 agreement until September 1999. Cook's

argument is nothing more than a red herring. Re/Max could not have sent Cook copies of the 1999 agreement before September 1999 because Re/Max continued to negotiate with Cook from June 1999 to September 1999 concerning the terms of the 1999 agreement. Cook cannot now claim that Re/Max failed to provide her with the agreement in a timely fashion after Re/Max accommodated her concern regarding the terms of the agreement by negotiating with her. Further, even after Re/Max provided Cook with the agreement in September 1999, Cook refused to sign it. When Re/Max inquired into her refusal in November 1999, Cook responded by unilaterally amending the agreed upon terms to ones more favorable to her. Still, Re/Max did not immediately send Cook a notice of default, but rather gave her additional time to execute the 1999 agreement and did not send her a notice of default until January 26, 2000. Cook repeatedly refused to execute the 1999 agreement, a refusal motivated by her desire to force Re/Max to assent to terms more favorable to her. However, a franchisee cannot hold hostage a franchisor's marks to force it to negotiate terms more favorable to the franchisee. Gorenstein Enterprises, Inc. v. Quality Care-USA, Inc., 874 F.2d 431, 435 (7th Cir. 1989).

   Cook next suggests that Re/Max terminated her franchise rights in violation of Wis. Stats. sec. 135.03. Under sec. 135.03 of the WFDL, "[no] grantor . . . may terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement without good cause." (emphasis added). Cook objects to a provision in the 2000 agreement that allowed Re/Max to issue commercial-only franchises in her protected area. Cook devotes much of her argument to establishing that Re/Max did not have "good cause" to include this provision in the 2000 agreement. Cook's argument is misdirected. The trial judge found that the alleged change did not "substantially change" the competitive circumstances of Cook and Re/Max's agreement. See East Bay Running Store, Inc. v. Nike, Inc., 890 F.2d 996, 999-1000 (7th Cir. 1989) (holding that the "good cause" requirement is not implicated without an initial finding that the franchisor terminated, cancelled, failed to renew, or

substantially changed the competitive circumstances of the dealership agreement).

Although Cook asserts that "commercial sales in [the Mukwonago-East Troy] area . . . continue[ ] to grow at among one of the fastest rates in the entire state of Wisconsin," she points to nothing in the record to support this assertion. Spath v. Hayes Wheels International-Indiana, Inc., 211 F.3d 392, 397 (7th Cir. 2000) ("a party who fails to develop the factual basis of a claim on appeal and, instead, merely draws and relies upon bare conclusions" has waived that claim). In any event, the evidence in the record recites a different story. Cook admits that since 1993 she has had only two commercial listings and has not gone to closing on either. Further, between March 27, 2000 and July 10, 2000, Re/Max sought to resolve the dispute with Cook, and she never did inform Re/Max that she objected to the provision of the 2000 agreement that allowed Re/Max to issue commercial-only franchises. Franchisors may make system-wide nondiscriminatory changes in order to adapt market conditions. Remus v. Amoco Oil Co., 794 F.2d 1238, 1240-41 (7th Cir. 1986); East Bay Running Store, Inc., 890 F.2d at 999-1000. We agree with the trial judge that the 2000 agreement arguably did not substantially change Cook's competitive circumstances.

Finally, in a last ditch effort, Cook reaches for straws and argues that she "substantially performed her obligations under the provisions of the January 26, 2000 notice." We need not spend much time dealing with this argument. Certainly, Cook cannot dispute that Re/Max was entitled to require its franchisees to operate with a valid franchise agreement. See, e.g., Moodie v. School Bd. Fairs, Inc., 889 F.2d 739, 745-46 (7th Cir. 1989). Cook suggests instead that her act of signing the expired, 1999 agreement should suffice. However, it is undisputed that Re/Max required all franchisees entering or renewing agreements after March 14, 2000 to sign the 2000 agreement, not the expired 1999 agreement. Further, the 1993 agreement, under which Cook had been operating, specifically required that Cook renew her franchise rights under the terms of the then-current agreement. Moreover, Re/Max's offer to allow Cook to sign exe

cute the 1999 agreement accompanied by a waiver clearly indicates that Re/Max obviously did not consider Cook's tardy execution of the 1999 agreement to be a substantial performance of her obligation under the January 26 notice. Re/Max is entitled to maintain uniform contract terms with its dealers. Id. It is not unreasonable for Re/Max to rewrite its franchise agreements in an orderly fashion. Wisconsin Music Network, Inc., 5 F.3d at 223.

In the end, Re/Max waited more than two years after the expiration of the 1993 franchise agreement to terminate Cook's franchise. When Cook disagreed with the terms of the 1999 agreement, Re/Max repeatedly attempted to negotiate with her regarding the agreement's terms. Even after these negotiations, Cook had almost 7 months during which she could have executed the 1999 agreement, and shestubbornly refused to do so, continuing to insist upon terms more favorable to herself. As we noted earlier, a franchisee cannot hold hostage a franchisor's marks to force it to negotiate terms more favorable to the franchisee. Gorenstein Enterprises, Inc., 874 F.2d at 435. Although Cook paints herself as someone who desperately wished to retain her Re/Max franchise, her actions speak louder than her words. Re/Max made every effort to accommodate her. We agree with the trial judge's ruling that Re/Max did not violate the WFDL when it finally terminated Cook's franchise and therefore was likely to succeed on the merits.

B.  Irreparable Injury and Inadequate Legal Remedy

A party seeking a preliminary injunction must demonstrate that they will suffer an irreparable injury if the injunction is not granted for which they have no adequate remedy at law. Gateway Eastern Rwy Co., 35 F.3d at 1137. Cook wildly asserts, without any precedent to support her assertion, that Re/Max cannot show it will suffer an irreparable injury merely because she has not "undertaken any action that could be considered deleterious to Re/Max's marks nor . . . is likely to do so in the future." We have clearly and repeatedly held that damage to a trademark holder's goodwill can constitute irreparable injury for

which the trademark owner has no adequate legal remedy. Eli Lilly & Co. v. Natural Answers, Inc., 233 F.3d 456, 469 (7th Cir. 2000); Meridian Mut. Ins. Co., 128 F.3d at 1114; Wesley-Jesson Division of Schering Corp., 698 F.2d 862, 867 (7th Cir. 1983). "The most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods. Even if the infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be imperiled by the acts of another." International Kennel Club of Chicago, Inc. v. Mighty Star, Inc., 846 F.2d 1079, 1092 (7th Cir. 1988). While Cook continues to use Re/Max's marks and logos, it has no quality over the services she provides or potential harm to its goodwill. Cook's argument that Re/Max has not established the existence of an irreparable injury for which there is no adequate remedy at law is without merit.

## C. Balance of Harms

Finally, Cook suggests that the trial court failed to adequately weigh the relative harm to the parties in granting the injunction. Cook argues that the injunction would "put [her] out of business." Cook's melodramatic interpretation of the impact of the assumption is without merit. The injunction does not prohibit Cook from maintaining relationships with existing clients or developing relationships with new clients--it only requires her to remove Re/Max logos. The injunction allows Cook to maintain her same office and listings and to work as an independent real estate agent or to select another real estate company to contract with. As noted above, Re/Max clearly has an interest in the goodwill it has in its marks and logos. Further, the public also has an interest in knowing with whom they do business and whether or not the agent is a franchisee of a given real estate corporation. We are convinced that the trial court carefully and properly weighed the extent of harm to each party, and we find no error in the court's balancing process.

## IV. Conclusion

We agree with the trial judge's ruling that Re/Max did not violate the WFDL when it terminated Cook's franchise rights. Accordingly, we hold that the trial judge properly found that Re/Max has a better than negligible chance of prevailing on the merits. We further hold that the trial judge correctly ruled that Re/Max has established that it will suffer an irreparable injury if the injunction were not granted. Finally, we hold that the trial judge carefully and properly weighed the harm to each party. We AFFIRM the trial court's grant of a preliminary injunction, prohibiting Cook from using Re/Max's marks and logos.

FOOTNOTES

/1 The record does not disclose whether any of the family members Cook hired had any real estate experience or current real estate licenses.

/2 A multiple listing service (MLS) is a facility by which a MLS member broker makes a blanket unilateral offer of subagency to any other MLS member who can find a buyer to complete the sale. The MLS computer data base contains information about homes listed for sale with its members. MLS members and their home- seeking prospects can review this data via computer terminals or by reviewing printed compilations distributed to members on a bi-weekly basis.

/3 Uniform franchise offering circulars are prospectuses that a franchisor submits to the marketplace for consideration by potential franchisees.