**RE/MAX NORTH CENTRAL, INC., Plaintiff,**

v.

**Patricia COOK, f/d/b/a RE/MAX Lake and Country, Defendant.**

No. CIV. A. 00–C–1314.

United States District Court, E.D. Wisconsin.

Nov. 13, 2000.

Troy A. Bader, Micheal E. Martinez, Gray, Plant, Mooty & Bennett, Minneapolis, MN, for Plaintiff.

Robert W. Roth, Roth & Binn, Brookfield, WI, for Defendant.

## DECISION ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

REYNOLDS, District Judge.

Plaintiff RE/MAX North Central, Inc. ("RE/MAX"), alleges that defendant Patricia Cook ("Cook") continues to sell real estate purporting to be a RE/MAX franchisee, despite RE/MAX's termination of Cook's franchisee rights. RE/MAX alleges that Cook's continued use of RE/MAX trademarks and logos is a violation of the Lanham Act. Because this case involves a question of federal law, the court has jurisdiction pursuant to U.S.C. § 1331. Before the court is RE/MAX's motion for a pre-liminary injunction, which the court grants.

On November 7, 2000, the court held an evidentiary hearing on RE/MAX's motion for a preliminary injunction. The findings of fact in this order are derived from that hearing as well as from the proposed findings of fact submitted by both parties.[1]

### FINDINGS OF FACT

Cook is a real estate broker whose place of business is located in Mukwonago, Wisconsin. In 1993, Cook and RE/MAX entered into a franchise agreement that gave Cook the right to operate a RE/MAX real estate office within a defined area that included Mukwonago, Wisconsin. The 1993 franchise agreement ("1993 Agreement") was for an initial term of five years, renewable under the same terms for two additional five-year terms. The 1993 Agreement provides that the Wisconsin Fair Dealership Law, Chapter 135 of the Wisconsin Statutes, governs the 1993 Agreement.

In late winter of 1997 and the early spring of 1998, Cook communicated to RE/MAX that she wanted to renew her franchise rights under the 1993 Agreement. In response, Cook received a letter from RE/MAX dated May 1, 1998, in which RE/MAX expressed concern that Cook did not have the requisite number of sales associates working in her office. The number of salespeople required to work at a RE/MAX office is a negotiated term in all RE/MAX franchise contracts. Cook was required by the 1993 Agreement to have a total of five sales associates working in her office.

The next correspondence Cook received concerning the renewal of her franchise was a letter from RE/MAX dated October 12, 1998, "purporting to terminate Cook's franchise...." (DFOF, App., Ex. C.) RE/MAX acknowledges that this termination

---

1. The court will refer to RE/MAX's October 20, 2000 proposed findings of fact as "PFOF," and Cook's October 27, 2000 response to PFOF as "DR." The court will refer to Cook's October 27, 2000 proposed findings of fact as "DFOF," and RE/MAX's November 1, 2000 response to DFOF as "PR."

letter was sent in error. RE/MAX then sent Cook a letter dated November 25, 1998, that constituted formal written notice of Cook's noncompliance in failing to employ a total of five salespeople, as required by the 1993 Agreement. In the same letter, RE/MAX informed Cook that she had sixty days to cure the defect by hiring more sales associates. Cook was informed, "If you satisfy the quota requirement by the 61st day, RE/MAX North Central will offer to renew your franchise." In mid-January 1999, Cook cured the defect in the number of sales associates, and RE/MAX acknowledged Cook's cure by letter and indicated that it would send a renewal contract to Cook.

The Regional Vice President of RE/MAX responsible for overseeing RE/MAX agents in Wisconsin and Minnesota testified that some of the sales agents hired by Cook to cure the defect in 1999 were Cook's own family members. Cook does not dispute this. The initial 1993 Agreement required Cook to employ five sales associates after a period of five years, and it did not prohibit Cook from hiring relatives. At the end of the initial five year term, however, Cook had failed to employ any sales associates. Cook was the only real estate broker operating out of her office from 1993–1999. The sales agents Cook hired in order to comply with the terms of the 1993 Agreement have not been active real estate agents. Cook is the only active real estate broker currently working out of her office.

On April 24, 1999, RE/MAX provided Cook a copy of its 1999 Franchise Offering Circular. RE/MAX contends that a copy of the 1999 Franchise Agreement ("1999 Agreement") was attached to the offering circular. (PR ¶ 22.) Cook says she did not receive a copy of the 1999 Agreement until June 21, 1999. (DFOF ¶ 23.) The court need not resolve this factual dispute in order to rule on the RE/MAX's motion for a preliminary injunction. In late June 1999, RE/MAX and Cook began negotiating about the number of sales associates

the 1999 Agreement would require Cook to employ. RE/MAX believed that a total of ten sales associates was appropriate. Cook wanted as few sales associates as possible. The parties ultimately agreed that the 1999 Agreement, like the 1993 Agreement, would require Cook to employ a total of five sales associates.

In mid-September 1999, Cook received from RE/MAX the execution copies of the 1999 Agreement. Cook did not sign the 1999 Agreement. Instead, Cook made changes to the 1999 Agreement by crossing out portions of it, including the terms relating to the number of sales associates Cook was required to employ. Cook wrote over the crossed out sales associates term, changing the 1999 Agreement to read that within five years, Cook would be required to employ a total of three, rather than five, sales associates. This change was unacceptable to RE/MAX, and no RE/MAX representative signed the edited 1999 Agreement.

After giving Cook a period of time to sign the 1999 Agreement with the five required sales associates term, RE/MAX then sent Cook a notice of default and termination letter dated January 26, 2000. The letter indicated that the basis for Cook's termination was that she had failed to sign and execute the 1999 Agreement. In the January 26, 2000 letter, RE/MAX indicated that Cook had sixty days to cure the existing defect by properly signing the then-current franchise agreement. RE/MAX indicated that if Cook chose to sign a franchise agreement after March 14, 2000 (which is within the sixty day time frame to cure the defect), Cook would have to sign the 2000 Franchise Agreement ("2000 Agreement") because the 1999 Agreement expired March 14, 2000.

On March 27, 2000, Cook signed the 1999 Agreement and returned it to RE/MAX. Cook maintains that she signed the 1999 Agreement because RE/MAX did not provide her with a copy of the 2000 Agreement to sign prior to March 27, 2000. (DFOF ¶ 28.) In contrast, RE/MAX con-

tends that it provided Cook with copies of the 2000 Agreement by overnight mail attached to a letter dated March 20, 2000. (PR ¶ 28.) The court need not resolve this factual dispute in order to decide whether to grant RE/MAX's motion for a preliminary injunction, because Cook admits that she did receive a copy of the 2000 Agreement in June 2000, and RE/MAX gave Cook another opportunity to sign the 2000 Agreement. In addition, RE/MAX offered Cook the option of signing the 1999 Agreement, provided that Cook also signed a release affirming that she would not sue RE/MAX for allowing her to sign an agreement that had already expired. Cook neither signed the 1999 Agreement nor the 2000 Agreement. RE/MAX extended Cook's time to cure the defect by signing either the 1999 Agreement and the release or the 2000 Agreement by July 5, 2000. Cook never signed either agreement.

The next letter Cook received from RE/MAX was dated July 12, 2000. It informed Cook that her franchise rights would be terminated effective August 10, 2000. Despite this termination, Cook continues to operate as RE/MAX franchisee, using RE/MAX's marks, logos, and copyrighted materials.

## CONCLUSIONS OF LAW

■ In deciding whether to grant a motion for a preliminary injunction, the court must first determine (1) whether plaintiff has demonstrated some likelihood of succeeding on the merits; and (2) whether plaintiff has demonstrated an inadequate remedy at law if preliminary relief is not granted. If plaintiff has demonstrated both factors, the court must then (3) consider the irreparable harm that defendant will suffer if the preliminary relief is granted, balanced against the harm to plaintiff; and (4) weigh the public interest by considering the effect of granting or denying relief on nonparties. *See Washington v. Indiana High Sch. Athletic Ass'n*, 181 F.3d 840, 845 (7th Cir.1999).

### I. *RE/MAX's Likelihood of Success on the Merits*

■ The Seventh Circuit has held that a party seeking a preliminary injunction demonstrates a likelihood of success on the merits by showing that it has "a 'better than negligible' chance of succeeding on the merits." *See Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1114 (7th Cir.1997), quoting *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir.1988), citing *Curtis v. Thompson*, 840 F.2d 1291, 1296 (7th Cir.1988). In the present case, Cook contends that RE/MAX cannot demonstrate likelihood of success on the merits because RE/MAX did not properly terminate Cook's franchise rights under the Wisconsin Fair Dealership Law. If Cook's franchise rights have not been terminated, Cook is properly doing business as a RE/MAX franchisee and therefore not violating the Lanham Act by infringing upon RE/MAX's trademark rights.

Cook was given a notice of default on January 26, 2000. RE/MAX believed that Cook was in default because she had not signed a new franchise agreement renewing her franchise rights, as required under the 1993 Agreement. The January 26 letter informed Cook that she had sixty days to cure the default by signing a franchise agreement. Cook argues that she did cure this default by signing and returning to RE/MAX the 1999 Agreement within the sixty-day cure time frame. The problem is that RE/MAX indicated to Cook in the January 26, 2000 default letter that if Cook chose to cure the default after March 14, 2000, she would be required to sign the 2000 Agreement because the 1999 Agreement expired on March 14, 2000. Cook argues that the Wisconsin Fair Dealership Law "trumps" RE/MAX's imposed March 14, 2000 deadline because the Fair Dealership Law mandates that a franchisor give a franchisee sixty days to cure any defect threatening termination of franchise

rights. In effect, Cook is arguing that RE/MAX could not bar Cook's signing the 1999 Agreement because the Wisconsin Fair Dealership Law gave her sixty days to sign the 1999 Agreement.

RE/MAX argues that Cook's default was not failing to sign the 1999 Agreement, but rather failing to sign the *then-existing* agreement renewing her franchise rights. After March 14, 2000, the then-existing agreement became the 2000 Agreement. RE/MAX argues that it gave Cook the full sixty days to sign an agreement, as required by the Fair Dealership Act. RE/MAX argues that its own obligations under law limited which agreement Cook could sign. On March 14, 2000, the 1999 Agreement expired, and RE/MAX believed that it was bound to enter into contracts with franchisees using the 2000 Agreement, which was registered with the state of Wisconsin and considered to be the current agreement in force.

After Cook's sixty days to sign the then-existing agreement had passed, RE/MAX continually extended Cook's time to cure the defect and renew her franchise rights by giving Cook the following options: 1) sign the 2000 Agreement or 2) sign the 1999 Agreement plus a release of any claims relating to RE/MAX's permitting Cook to sign an expired agreement. Cook does not indicate to the court why she was unwilling to sign the 1999 Agreement and accompanying release. The court finds that RE/MAX has properly terminated Cook's franchise rights under the Wisconsin Fair Dealership Law.

■ Cook makes a second argument about RE/MAX's likelihood of success on the merits. Cook maintains that she does not want to sign the 2000 Agreement because it allows RE/MAX to issue commercial-only real estate licenses to other real estate brokers in the Mukwonago area. This provision in the 2000 Agreement does not prohibit Cook from selling commercial real estate, but Cook maintains that it will result in increased competition for her business. Moreover, Cook argues that the

provision violates sec. 135.03 of the Wisconsin Statutes by substantially changing the competitive circumstances of a dealership agreement without good cause.

It is not clear to the court that the 2000 Agreement substantially changes the competitive circumstances of Cook and RE/MAX's agreement. Cook admits that in the time she has worked as a RE/MAX real estate agent, she has had only two commercial real estate listings and has not gone to closing on either listing. In Cook's estimation, there have been no more than 10 commercial real estate deals in the Mukwonago area since 1993. Cook believes, however, that the area is growing rapidly and will experience commercial development. It is important to note that even under the 2000 Agreement, Cook would still be permitted to sell commercial real estate. That RE/MAX may issue a commercial-only license to another RE/MAX agent in the area does not seem to change substantially Cook's ability to compete. Any licensed real estate agent from anywhere in Wisconsin may sell commercial real estate in the Mukwonago area. Cook simply does not have an exclusive identifiable market area in commercial real estate in Mukwonago.

The Seventh Circuit recognized in *Remus v. Amoco Oil Co.,* 794 F.2d 1238, 1240–41 (7th Cir.1986), that franchisors may from time to time make system-wide, nondiscriminatory changes in order to adapt to market conditions. This is true even if the change hurts the profitability of some franchisees. *See East Bay Running Store v. NIKE, Inc.,* 890 F.2d 996 (7th Cir.1989). In present case, Cook was not singled out in being asked to sign the 2000 Agreement. All franchisees entering or renewing agreements with RE/MAX were required to sign the 2000 Agreement after March 14, 2000. RE/MAX has a better than negligible chance of proving that the 2000 Agreement did not substantially change Cook's competitive circumstances and that it was a system-wide, nondiscriminatory change.

## II. *Inadequate Remedy at Law*

RE/MAX has demonstrated that there is an inadequate remedy at law for Cook's continued use of RE/MAX marks and logos. Damage to a trademark holder's goodwill can constitute irreparable injury for which the trademark owner has no adequate remedy at law. See *Meridian Mut. Ins. Co. v. Meridian Ins. Group,* 128 F.3d 1111 (7th Cir.1997). RE/MAX maintains that while Cook continues to use RE/MAX marks and logos, RE/MAX has no control over the quality of services Cook provides or any potential harm to RE/MAX's goodwill potentially resulting from Cook's unauthorized use of RE/MAX marks. Cook argues that she has no reason to damage the reputation of RE/MAX because she wants to continue operating as a RE/MAX real estate agent and would not do anything to jeopardize her business. RE/MAX argues, however, that the real injury it suffers is the loss of control that occurs when an unauthorized individual does business as a RE/MAX representative; whether Cook actually harms RE/MAX's goodwill is a secondary concern. RE/MAX also argues that it is confusing to consumers if an individual not properly affiliated with RE/MAX holds herself out as a RE/MAX real estate agent. The court finds that the loss of control RE/MAX suffers is an injury that has an inadequate remedy at law.

## III. *Balancing Harm to the Parties and Weighing the Public Interest*

Cook did not testify at the hearing regarding the effect on her business if she is no longer permitted to use RE/MAX marks and logos. In Cook's brief opposing summary judgment, she argues that she would be, "put out of business for a substantial period of time and perhaps for good, and any profits lost by her as a result of being terminated would be very difficult to calculate." (Def.'s Oct. 27, 2000 Br. at 9.)

The court acknowledges that Cook may suffer some harm as a result of her inability to do business as a RE/MAX real estate agent; however, the Regional Vice President of RE/MAX responsible for overseeing RE/MAX agents in Wisconsin and Minnesota testified that after Cook de-identifies with RE/MAX, she will still be able to operate her real estate business in Mukwonago. Cook will be able to keep both her clients real estate listings, and maintain her office in the same location. The only real change will be that Cook will no longer be permitted to use the RE/MAX marks and logo. Contrary to her assertion, Cook will still be able to "be in business" as a real estate broker in Mukwonago.

The harms RE/MAX will suffer if Cook is allowed to continue doing business as a RE/MAX real estate agent, as discussed above, are that RE/MAX would lose control with regard to the quality of services provided under its name and risk damage to its goodwill.

In addition, the public has an interest in knowing with whom they are doing business. If members of the public are dissatisfied with Cook's services, they should know that she is not affiliated with RE/MAX.

In weighing the potential harm done to the parties and taking into account interests of members of the public, the court concludes the potential harm to RE/MAX in not granting the preliminary injunction outweighs potential harm to Cook in granting the preliminary injunction.

### CONCLUSION

Plaintiff RE/MAX North Central, Inc.'s motion for a preliminary injunction is GRANTED by an order issued this date.

## ORDER DATED GRANTING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

For the reasons discussed in the decision dated November 13, 2000, the court **GRANTS** plaintiff RE/MAX North Central, Inc.'s motion for a preliminary injunc-

tion and **ORDERS** defendant Patricia Cook to:

(a) cease using or displaying the RE/MAX name or any of RE/MAX North Central, Inc.'s or RE/MAX International's trademarks or service marks in any manner in connection with the operation or promotion of her real estate business without a license from RE/MAX North Central, Inc.;

(b) cease using or displaying any of RE/MAX North Central Inc.'s or RE/MAX International's copyrighted materials in any way in connection with the operation or promotion of her real estate business without permission from RE/MAX North Central, Inc.;

(c) cease using, advertising or displaying the telephone number Patricia Cook's office used when it was a licensed RE/MAX office; and

(d) cease providing real estate services at her real estate office until Patricia Cook certifies to the court and RE/MAX North Central, Inc., that she has completely discontinued her use of the RE/MAX marks in connection with the operation or promotion of her real estate business.