Ralph Gentile, Inc., d/b/a Gentile Nissan,
Petitioner-Appellant,†

v.

State of Wisconsin Division of Hearings
and Appeals, Respondent-Respondent,

Nissan North America, Inc.,
Interested Party-Respondent.

Court of Appeals

*No. 2010AP2524. Submitted on briefs May 3, 2011.
—Decided May 24, 2011.*

2011 WI App 98

(Also reported in 800 N.W.2d 555.)

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *Paul R. Norman* and *Eric A. Baker* of *Boardman, Suhr, Curry & Field, LLP*, Madison.

On behalf of the interested party-respondent, the cause was submitted on the brief of *Thomas M. Devine* and *Anthony P. Hahn* of *Hostak, Henzl & Bichler, S.C.*, Racine and *Steven J. Wells* of *Dorsey & Whitney LLP*, Minneapolis, Minnesota.

Before Fine, Kessler and Brennan, JJ.

¶ 1. FINE, J. Ralph Gentile, Inc., d/b/a Gentile Nissan, appeals the circuit court order affirming a decision of the Division of Hearings and Appeals determining that Nissan North America lawfully terminated Ralph Gentile's Nissan dealership. *See* WIS. STAT. § 218.0114(7)(d) (Dealer may complain to the Department of Transportation that cancellation of dealership was "unfair"; complaint heard and decided by "the division of hearings and appeals."). Ralph Gentile argues that the Division improperly interpreted the applicable statutes, WIS. STAT. §§ 218.0114(7)(a)3, 218.0114(7)(d) & 218.0116, by concluding that: (1) Ralph Gentile materially breached its dealership agreement with Nissan North America and thus Nissan North America had "just provocation" to terminate Ralph Gentile's dealership agreement, *see* §§ 218.0114(7)(d) & 218.0116(1)(i)1.b; and (2) the termination satisfied the statute's "due regard to the equities" requirement, *see* §§ 218.0114(7)(d) & 218.0116(1)(i)1.a. We affirm.

715

## I.

¶ 2. Nissan North America is a California corporation that, among other things, distributes its automobiles through dealers, and is licensed to do business in Wisconsin. As material to this appeal, Ralph Gentile owns both Gentile Nissan and Gentile Hyundai, and operated Gentile Nissan under a 2002 term dealership agreement between Nissan North America and Ralph Gentile's predecessor.[1] A term dealership agreement, as the Division noted, "differs from the standard agreement" Nissan North America uses with its dealers "in that it has an expiration date." The initial term dealership agreement expired on January 1, 2005, and was extended to July 1, 2006. According to the Division, Nissan North America "was unwilling" to give Gentile Nissan a standard dealership agreement "because of its unsatisfactory sales performance."

¶ 3. By letter dated June 30, 2006, Nissan North America sent Gentile Nissan a Notice of Default alleging breach of dealership performance standards. The notice gave Gentile Nissan 180 days to cure the alleged breach. By letter dated January 3, 2007, Nissan North America terminated Gentile Nissan's dealership agreement and gave the following reasons: (1) "Unsatisfactory Sales Penetration Performance," alleged to breach Section 3 of the dealership agreement; and (2) "Unsatisfactory Customer Satisfaction Performance," alleged

---

[1] None of the parties contend that the changes in corporate structure affect the issues on this appeal. Accordingly, we ignore those changes. WISCONSIN STAT. ch. 218, which, among other things, regulates motor vehicle dealers in this state, recognizes that, as used in that chapter, the word " '[a]greement' means a contract that describes the franchise relationship between manufacturers, distributors, importers and dealers." WIS. STAT. § 218.0101(1).

to breach section 5F of the dealership agreement. (Bolding and underlining omitted.) As noted, the Division upheld Nissan North America's termination of Gentile Nissan's dealership agreement. The Division found that although Gentile Nissan breached Section 3 of the dealership agreement, Gentile Nissan did not breach Section 5F, which concerned the satisfaction of Gentile Nissan customers. Accordingly, we only discuss the Division's findings and conclusions in connection with Section 3.

## II.

¶ 4. Ralph Gentile's appeal attacks the Division's decision. Accordingly, we review that decision and not that of the circuit court. *See Weston v. Wisconsin Dep't of Workforce Development*, 2007 WI App 167, ¶ 11, 304 Wis. 2d 418, 428, 737 N.W.2d 74, 78. The Division's findings of fact are binding on us if they are supported by " 'substantial evidence.' " *See Volvo Trucks North America v. State of Wisconsin Dep't of Transportation*, 2010 WI 15, ¶ 19, 323 Wis. 2d 294, 305, 779 N.W.2d 423, 428; WIS. STAT. § 227.57(6) ("If the agency's action depends on any fact found by the agency in a contested case proceeding, the court shall not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact.").

> Substantial evidence does not mean a preponderance of evidence. It means whether after considering all the evidence of record, reasonable minds could arrive at the conclusion reached by the trier of fact. "The weight and credibility of the evidence are for the agency, not the reviewing court, to determine." An agency's findings of fact may be set aside only when a reasonable trier of

fact could not have reached them from all the evidence before it, including the available inferences from that evidence.

*Volvo Trucks*, 2010 WI 15, ¶ 19, 323 Wis. 2d at 306, 779 N.W.2d at 428–429 (footnotes and quoted source omitted). The parties agree, and so do we (as did the circuit court), that we should give "due weight" deference to the Division's interpretation of the applicable statutes.

> Courts applying "due weight" deference will sustain an agency's statutory interpretation if it is not contrary to the clear meaning of the statute and no more reasonable interpretation exists. Applying "due weight" deference, a reviewing court will not set aside the agency's interpretation in favor of another equally reasonable interpretation, but will replace it with a more reasonable interpretation if one exists.

*Id.*, 2010 WI 15, ¶ 15, 323 Wis. 2d at 304, 779 N.W.2d at 427–428 (footnotes omitted).

¶ 5. Although we thus give to the Division substantial deference in connection with its findings of fact and its interpretation of the applicable statutes, our review of the contracts in this case is *de novo. See Wisconsin End-User Gas Ass'n v. Public Service Commission of Wisconsin*, 218 Wis. 2d 558, 566, 581 N.W.2d 556, 559 (Ct. App. 1998). Whether a party to a contract has committed a "material breach" of that contract, however, is a question of fact. *Volvo Trucks*, 2010 WI 15, ¶ 50 n.28, 323 Wis. 2d at 315 n.28, 779 N.W.2d at 433 n.28 ("Whether a material breach of contract has occurred is a question of fact to be determined by the fact finder."). Unless there are no disputed material facts, whether a breaching party has cured the breach is also a question of fact. *Id.*, 2010 WI 15, ¶ 50, 323 Wis. 2d at

315–316, 779 N.W.2d at 433. With these standards in mind, we turn to the applicable statutes and Ralph Gentile's contentions.

¶ 6. WISCONSIN STAT. § 218.0114(7)(d), which concerns hearings before the Division on a dealer's complaint that its franchise was improperly cancelled, provides that the "manufacturer, distributor, or importer" has the burden to prove that the "cancellation was fair, for just provocation, and with due regard to the equities." WISCONSIN STAT. § 218.0116(1)(i)2 similarly provides that "[a] license" of a "manufacturer, importer or distributor" "may be denied, suspended or revoked" if it "unfairly, without due regard to the equities or without just provocation, directly or indirectly cancel[s] or fail[s] to renew the franchise of any motor vehicle dealer."

¶ 7. " 'Due regard to the equities' means treatment in enforcing an agreement that is fair and equitable to a motor vehicle dealer . . . and that is not discriminatory compared to similarly situated dealers." WIS. STAT. § 218.0116(1)(i)1.a. " 'Just provocation' means a material breach by a motor vehicle dealer . . . due to matters within the dealer's . . . control, of a reasonable and necessary provision of an agreement and the breach is not cured within a reasonable time after written notice of the breach has been received from the manufacturer, importer or distributor." WIS. STAT. § 218.0116(1)(i)1.b. Thus, "just provocation" has four elements:

- the terminated dealer must "materially breach" the dealership agreement;

- the breached provision of the dealership agreement must be "a reasonable and necessary provision";

719

- the "material breach" must have been caused by "matters within the dealer's . . . control"; and

- the dealer has not "cured" the breach "within a reasonable time" after it got "written notice of the breach."

WISCONSIN STAT. § 218.0114(7)(a)3 provides, as material, that "a manufacturer, distributor or importer shall notify a dealer . . . of the . . . cancellation of the [dealership] agreement . . . together with the specific grounds for . . . cancellation of the agreement."

## III.

¶ 8. Before we analyze Gentile Nissan's contentions we first look at the contract provisions Nissan North America accused Gentile Nissan of breaching, and the Division's findings of fact. As noted, we limit our analysis to Section 3 because the Division concluded that Gentile Nissan did not breach Section 5F.

A. *The Contract.*

¶ 9. Section 3A of the dealership agreement set out the dealer's "General Obligations":

Dealer shall actively and effectively promote through its own advertising and sales promotion activities the sale . . . of Nissan vehicles to customers located within the Dealer's Primary Market Area. Dealer's Primary Market Area is a geographic area which [Nissan North America] uses as a tool to evaluate Dealer's performance of its sales obligations hereunder.

Section 3B explained how the dealer's fulfillment of those obligations would be assessed:

Dealer's performance of its sales responsibility for Nissan Cars and Nissan Trucks will be evaluated by

[Nissan North America] on the basis of such reasonable criteria as [Nissan North America] may develop from time to time, including, for example:

1. Achievement of reasonable sales objectives which may be established from time to time by [Nissan North America] for Dealer as standards for performance;

2. Dealer's sales of Nissan Cars and Nissan Trucks in Dealer's Primary Market Area and/or the metropolitan area in which Dealer is located, as applicable, or Dealer's sales as a percentage of:

(i) registrations of Nissan Cars and Nissan Trucks;

(ii) registrations of Competitive Vehicles;

(iii) registrations of Industry Cars;

(iv) registrations of vehicles in the Competitive Truck Segment;

3. A comparison of Dealer's sales and/or registrations to sales and/or registrations of all other Authorized Nissan Dealers combined in [Nissan North America] Sales Region and District in which Dealer is located . . .

4. A comparison of sales and/or registrations achieved by Dealer to the sales or registrations of Dealer's competitors.

Section 3C explained how a Dealer's location in an area where it had competition from other Nissan dealers affected the assessment process:

If Dealer is located in a metropolitan or other marketing area where there are located one or more Authorized Nissan Dealers other than Dealer, the combined sales performance of all Nissan Dealers in such metropolitan or other marketing area may be evaluated as indicated in Sections 3.B.2 and 3.B.3 above, and

Dealer's sales performance may also be evaluated on the basis of the proportion of sales and potential sales of Nissan Vehicles in the metropolitan or other marketing area in which Dealer is located for which Dealer fairly may be held responsible.

Section 3D acknowledged that the dealer's measured sales performance might be affected by matters beyond the dealer's control:

Where appropriate in evaluating Dealer's sales performance, [Nissan North America] will take into account such reasonable criteria as [Nissan North America] may determine from time to time, including, for example, the following: the Dealership Location; the general shopping habits of the public in such market area; . . . any special local marketing conditions that would affect Dealer's sales performance differently from the sales performance of other Authorized Nissan Dealers; the recent and long term trends in Dealer's sales performance; the manner in which Dealer has conducted its sales operations (including advertising, sales promotion, and treatment of customers); and the other factors, if any, directly affecting Dealer's sales opportunities and performance.

¶ 10. Further, Section 3 required that the dealer "organize and maintain a sales organization that includes a sufficient number of qualified and trained sales managers and sales people to enable Dealer to effectively fulfill its responsibilities under this Section 3." Finally, as material to this appeal, Section 3 required the dealer to "promptly take such action as may be required to correct any deficiencies in Dealer's performance of its responsibilities under this Section 3" when Nissan North America's periodic evaluations of the dealer disclosed problems with its fulfillment of the dealer's sales-performance obligations.

722

## B. *Division's Findings of Fact.*

¶ 11. The Division made extensive findings. Given the extreme deference that we owe to those findings and the importance of those findings to this appeal, we set them out at some length.

- Gentile Nissan's Primary Market Area was Racine and Kenosha counties.

- Gentile Nissan was "geographically located" in what Nissan North America designated as the "North Central Region": "the United States bordered on the east by the Ohio/Pennsylvania border, Kentucky on the South, on the west to parts of Missouri, Iowa, and South and North Dakota, and the Canadian border on the north."

- Nissan North America also divides the sales regions into districts. "District 4 primarily consists of the Nissan dealers in Wisconsin."

- Nissan North America "interprets" the sales requirements set out in Section 3 "to require Gentile Nissan to sell the number of new vehicles that would be required to meet the regional average for Nissan's sales penetration based on the number of competitive registrations in [Gentile Nissan's Primary Market Area]. This standard is referred to as regional sales effectiveness and is a common performance standard in the motor vehicle retail industry."

- A Nissan dealer's sales performance is measured on a metric that calculates what the dealer is expected to sell in a particular year versus what it actually does sell. A dealer has a "100% sales effective" rating if it meets the "expected" number of sales, and a rating of less or more than 100% if it sells fewer or more vehicles than expected.

723

- "Expected sales are calculated as if all a dealer's sales were to residents of the dealer's [Primary Market Area], but actual sales are counted regardless of where the vehicle is registered."

- "Nissan [North America] made it abundantly clear to Gentile Nissan in a number of documents that it was evaluating [Gentile Nissan]'s sale performance based on sales effectiveness."

- From 2003 through 2007, Gentile Nissan had the following "sales effectiveness" ratings:
 - 2003—58.3%
 - 2004—54.5%
 - 2005—52.2%
 - 2006—47.6%
 - 2007—40.7%

- In July of 2002, Ralph Gentile's predecessor purchased the Nissan dealership from a dealer in Kenosha. The dealership was in Kenosha, and Ralph Gentile's predecessor moved it to Racine with Nissan North America's approval.

- From 1999 through 2001, the predecessor Kenosha dealership had the following "sales effectiveness" ratings:
 - 1999—79.4[%]
 - 2000—81.7[%]
 - 2001—110.6[%]

Gentile Nissan's Primary Market Area "is essentially the same [Primary Market Area] that had been assigned to Kenosha Nissan."

- "The industry considers a dealer that is 100% sales effective to be an average dealer."

724

- In 2006, "the average sales effectiveness of Nissan dealers in the North American Central Region was 117.9%."

- In 2006, "69.6% of the Nissan dealers in the [North American Central] region exceeded the region average."

- "While Gentile Nissan's sales of Nissan vehicles were declining, Nissan sales nationally, in the North Central region and in Wisconsin were increasing."

- "During the time period from 2003 until 2006, . . . Nissan's sales nationally, in the North Central Region, and in Wisconsin increased by 31.5%, 17.3%, and 49.5% respectively."

- "[T]he local economy in southeastern Wisconsin is not a factor in evaluating Gentile Nissan's sales performance because Gentile Nissan's expected sales was [sic] calculated as a percentage of total sales in the Gentile Nissan's [Primary Market Area]. In other words, Gentile is only expected to get Nissan's average share of sales in the [Primary Market Area]. If for some reason new vehicle sales were depressed in southeastern Wisconsin, Gentile Nissan's expected sales would be reduced proportionately."

- "[S]ales staffs for Gentile Nissan and Gentile Hyundai were cross trained to sell both Nissans and Hyundais. Because of bonuses for selling Hyundais, the sales people had greater incentives to sell Hyundais than Nissans."

- Gentile Nissan had a "revolving door for sales managers" and this "likely was part of the reason for Gentile Nissan's poor sales performance."

- "For 2005, [Nissan North America]'s goal for Gentile Nissan's advertising was $19,560 per month and the

725

amount Gentile Nissan spent was $15,071. It is also noteworthy that using the figures provided by Gentile Nissan, Gentile Nissan did not meet its own internal goals for Nissan advertising." (Record reference omitted.)

- "If Gentile Nissan had been attempting to sell the number of vehicles it was expected to sell, the amount it spent on advertising in 2005 and 2006 was inadequate. Advertising is only one component of actively and effectively promoting the sale of Nissan vehicles; however, there is evidence in the record of the direct effect of advertising on sales. Gentile Nissan reduced the amount it spent on advertising from 2005 to 2006. Its new Nissan sales decreased from 273 to 213 during the same period."

- "Gentile Nissan was not spending the amount it was required to spend to effectively promote Nissan products."

- "In 2006, the year ending prior to the issuance of the Notice of Termination, Gentile Nissan ranked last out of seventeen Nissan dealers in Wisconsin.[2] It also ranked 164 out of 184 Nissan dealers in the North Central region."

- Gentile Nissan breached the provision of the dealership agreement that required it to "actively and effectively promote through its own advertising and sales promotion activities the sale . . . of Nissan vehicles to customers located within the Dealer's Primary Market Area."

- "During the cure period [following receipt of the notice of default on June 30, 2006], Gentile Nissan's

---

[2] Presumably, the Division is referring to the January 3, 2007, letter terminating Gentile Nissan's dealership, after the requisite time within which to cure the alleged breach of the dealership agreement, which was triggered by the June 30, 2006, letter.

726

sales effectiveness declined further. So, not only did Gentile Nissan not cure the breach, its performance worsened."

The Division assessed the scope of "similarly situated dealers," used by WIS. STAT. § 218.0116(1)(i)1.a, as an overlay with which to determine whether a dealer's termination is "fair and equitable":

> The phrase "similarly situated dealers" is not defined in the statute. At a minimum, other Wisconsin single point Nissan dealers should be considered dealers similarly situated to Gentile Nissan. With respect to other Wisconsin dealers, Gentile Nissan is the lowest performing Nissan dealer in terms of sales performance. Nissan [North America]'s termination of Gentile Nissan's franchise is not discriminatory compared to its treatment of other Wisconsin Nissan dealers. Since Gentile Nissan's sales performance is compared to the average of Nissan dealers in the North central region, one could argue that all Nissan dealers in the North Central region could be considered similarly situated. However, there are too many variables such as market conditions and state regulations to compare Nissan [North America]'s treatment of Gentile Nissan with respect to all the Nissan dealers in the North Central region. Nissan [North America]'s termination of Gentile Nissan's franchise is not discriminatory with respect to other similarly situated dealers.

Based on its analysis of the Record before it, the Division found:

> Although Nissan [North America] terminated Gentile Nissan's franchise after it had been in operation for only five full years, the termination was reasonable because Gentile Nissan's sales performance was declining for no apparent reason other than [Gentile Nissan]'s lack of effort. It was reasonable for Nissan [North America] to terminate Gentile Nissan's fran-

chise before the situation deteriorated any further. Nissan [North America]'s decision to terminate Gentile Nissan's Dealer Agreement was fair and equitable.

## IV.

¶ 12. We now analyze Ralph Gentile's contentions that we should reverse the circuit court's order affirming the Division's dismissal of Ralph Gentile's complaint.

A. *Sales Effectiveness Criteria.*

¶ 13. The January 3, 2007, letter terminating Gentile Nissan's dealership asserted that despite the June 30, 2006, notice to cure, and attempts by Nissan North America to help Gentile Nissan with what Nissan North America perceived as Gentile Nissan's "unsatisfactory sales performance," Gentile Nissan's "sales penetration continue[d] to fall significantly below regional average." Ralph Gentile tells us that it "does not dispute the Division's finding that 'sales effectiveness' is a performance standard generally used in the motor vehicle industry."

¶ 14. In a largely unfocused argument, Ralph Gentile complains that the Division unfairly conflated the requirement in Section 3A that Gentile Nissan promote the sale of Nissan vehicles in its Primary Market Area with the sales assessment criteria in Section 3B. It contends that by using "dealer sales anywhere in the country, sales effectiveness does not measure the effectiveness of a dealer's promotional efforts within its own [Primary Market Area]." It argues that "[o]nly a sales performance standard based on Nissan sales within the [Primary Market Area] can

accurately measure the effectiveness of Gentile's promotional activities within the [Primary Market Area]."[3] As we have seen, however, the Division found that Gentile Nissan significantly lagged in regional sales effectiveness, even though the metric *combined* the dealer's sales within *and* outside its Primary Market Area— "actual sales are counted regardless of where the vehicle is registered." Thus, if Gentile Nissan had done a superb job of promoting and selling Nissan vehicles within its Primary Market Area, as Section 3A of the agreement required, its sales effectiveness would have been high; again, contrary to Ralph Gentile's contention that it was a *bonus* that it also got credit for sales outside its Primary Market Area.[4]

¶ 15. Further, the Division found, as we have also seen, that Gentile Nissan did not spend what "it was required to spend to effectively promote Nissan products." Significantly, there are charts in the Record that show Gentile Nissan near the bottom of "Nissan Dealers'

---

[3] As we see later in ¶¶ 21–22, we reject Ralph Gentile's contention that Section 3 only obligated Gentile Nissan to "promote" Nissan vehicles, not sell them.

[4] Thus, Ralph Gentile argues that because Gentile Nissan had a *higher* percentage of sales within its Primary Market Area when compared to Gentile Nissan's national sales (for 2006: of Gentile Nissan's total sales of 217, 182 were sales within its Primary Market Area) than did another Nissan dealer in southeastern Wisconsin (for 2006: of Gordie Boucher's total sales of 615, 222 were sales within its Primary Market Area), it successfully fulfilled its obligation to promote Nissan vehicles in its Primary Market Area. As noted in the main text, however, this argument ignores the fact as found by the Division that Gentile Nissan's sales effectiveness was inadequate; it was an inadequacy that would have been ameliorated *if* Gentile Nissan had been as successful promoting the sales of Nissan vehicles in its Primary Market Area as it contends it was.

Sales in Own [Primary Market Area]/Metro as a Percent of North Central Region Average North Central Region . . . - 2006" (uppercasing omitted) and "Nissan Dealers' Sales in Own [Primary Market Area]/Metro as a Percent of North Central Region [] Average State of Wisconsin - 2006" (uppercasing omitted). Additionally, there is a chart in the Record that shows "Gentile Nissan Sales in Racine [Primary Market Area] as a Percent of Competitive Registrations vs Wisconsin Average" (uppercasing omitted) for the years 2004 through June of 2007 as being barely one-half of, or less than, the average of competitive registrations.

¶ 16. Ralph Gentile has not shown that sales effectiveness, as used by Nissan North America and accepted by the Division, was improper. Further, insofar as Ralph Gentile contends that the Chrysler factory in Kenosha County adversely affected Gentile Nissan's sales beyond Gentile Nissan's control, the Division found, as we have seen, that Kenosha Nissan, then located in Kenosha County, had better sales effectiveness than did Gentile Nissan when it took over the dealership and moved it to Racine, and also determined that the "local economy" was "not a factor in evaluating Gentile Nissan's sales performance."[5]

---

[5] Ralph Gentile also argues that Gentile Nissan was adversely affected by matters beyond its control because it was the "only . . . Nissan dealer in the Racine/Kenosha [Primary Market Area], while several competitive brands had two or more dealers in the [Primary Market Area]." First, Ralph Gentile does not explain how this Nissan "monopoly" for Gentile Nissan hurts its efforts to sell Nissan vehicles. Second, it also does not explain how or why that non-Nissan competition differed from general automobile competition in the areas against which Gentile Nissan's sales effectiveness was measured. *See Vesely v. Security First National Bank of Sheboygan Trust Dep't*, 128 Wis. 2d 246,

¶ 17. The facts found by the Division clearly show that Gentile Nissan's sales performance was well below what it should have been. There is more than "substantial evidence" in the Record to support those findings. Indeed, as we have seen, Gentile Nissan's sales-effectiveness ratings were far below the Kenosha dealership from whom Ralph Gentile's corporate predecessor bought the Nissan franchise.

B. *The "Best Efforts" Clause.*

¶ 18. Ralph Gentile argues that Gentile Nissan did not have to successfully sell Nissan vehicles but only had to use its "best efforts" to do so. It bases this contention on a June 26, 2006, amendment to the term dealership agreement. The amendment provided, as material (all bolding and underlining in original):

> **Article Twelfth (e),** is hereby amended to read as follows:
>
> **A. *Sales Performance***
>
> [Gentile Nissan] agrees that it will use its best efforts to meet or exceed the North Central Region average sales penetration for the Nissan total competitive car and truck segment on or before **July 1, 2006** based on data available at that time and at all times thereafter.

Article Twelfth of the term dealership agreement reads as material:

> If this agreement is not terminated prior to the expiration date set forth in the Final Article, [Nissan North America] may offer to enter into as of such date a Nissan Dealer Sales & Service Agreement in such

255 n.5, 381 N.W.2d 593, 598 n.5 (Ct. App. 1985) (We will not address arguments that are not sufficiently developed.).

form as may be in use by [Nissan North America] at such time. [Nissan North America] will make the offer and Dealer may accept such offer only if Dealer has fulfilled and continues to fulfill, during the term of this Agreement and at the expiration thereof, of all the following conditions, each of which Dealer understands and agrees to be reasonable and necessary:

The clause sets out in subparts (a) through (d) the specific preconditions to the offer by Nissan North America of a non-term, standard dealership agreement. Subpart (e) reads: "(e) Other conditions (if any): See Exhibit 'A', which is incorporated by this reference into this Agreement for all purposes." The "Exhibit 'A' " is the "best efforts" amendment, set out above.

¶ 19. As we have seen, we interpret and apply *de novo* the parties' contracts under the standards we have already explained. By its clear language, the "best efforts" clause was an amendment to "**Article Twelfth (e),**" which was a "condition" to an offer by Nissan North America of a standard dealership agreement. Thus, the words "for all purposes" is cabined within "**Article Twelfth**" and modifies the conditions (a) through (d) that Gentile Nissan had to meet before being offered a non-term dealership agreement.[6] By its terms, the

---

[6] The conditions (a) through (d) are:

(a) Comply with [Nissan North America]'s net working capital, net worth requirements as specified in Section 6.E and in amount not less than the Guides therefor as specified in the Final Article of this Agreement;

(b) Provide [Nissan North America], on or before the tenth day of each month, on such forms as may be designated by [Nissan North America], with the financial and operating statement specified in Section 6.G.1 of the Standard Provisions;

(c) If New Dealership Facilities are required under Article Twelfth (d), below:

amendment, which inserted the "best efforts" language in subsection (e) of **Article Twelfth**," made Gentile Nissan's "best efforts" a condition to getting an offer of standard dealership agreement and nothing more.[7]

C. *Just Provocation.*

¶ 20. Ralph Gentile argues that the Division erroneously interpreted the "reasonable and necessary

(i) Complete the acquisition and installation, at the New Dealership Facilities, of signs, furniture, furnishings, tools and equipment as required by [Nissan North America] for Dealer's New Dealership Facilities;

(ii) Employ that number of qualified persons to operate the dealership required by [Nissan North America] for Dealer's New Dealership Facilities;

(iii) Comply with all other [Nissan North America]'s requirements for Dealer to operate the New Dealership Facilities and qualify in all other respects for a Nissan Dealer Sales & Service Agreement;

(iv) Comply with all federal, state and local governmental licensing and other requirements for Dealer to do business as an Authorized Nissan Dealer at the New Dealership Facilities;

d) New Dealership Facilities (or upgrade to existing Dealership Facilities, if applicable);

[7] Ralph Gentile misreads what would happen if Gentile Nissan *did* use its "best efforts" pursuant to the amendment to Article Twelfth of the term dealership agreement when it asserts that if Gentile Nissan used its "best efforts" Nissan North America would be "requir[ed] . . . to renew." As we see, however, Article Twelfth provided that if Gentile Nissan satisfied the conditions expressed in that Article, Nissan North America "*may offer* to enter into as of such date a Nissan Dealer Sales & Service Agreement." (Emphasis added.) Generally "may" means the action is permissive, not mandatory. *See Mercantile Contract Purchase Corp. v. Melnick*, 47 Wis. 2d 580, 590, 177 N.W.2d 858, 863 (1970) (statutory construction).

provision" of WIS. STAT. § 218.0116(1)(i)1.b. The essence of Ralph Gentile's complaint is that applying Section 3B (the criteria used to measure sales performance) of the term dealership agreement concurrently with Section 3A results in a faux breach of Section 3A because, as phrased by Ralph Gentile's brief, the criteria in Section 3B do "not accurately measure the dealer's performance of its obligations under" Section 3A. Thus, Ralph Gentile argues, Section 3A is not a "reasonable provision." We have already determined, however, that the Division did not err in applying the criteria in Section 3B of the agreement. Accordingly, the Division did not err—especially when, as noted, we must give its interpretation of the statute "due weight" deference—in concluding that Section 3A was a "reasonable and necessary provision" under § 218.0116(1)(i)1.b so that the "just provocation" condition was met.

¶ 21. Ralph Gentile also argues that the Division erred by focusing on Gentile Nissan's actual sales, rather than the total sales of Nissan vehicles in Gentile Nissan's Primary Market Area irrespective of whether those sales were made by Gentile Nissan *or other Nissan dealers*. Ralph Gentile contends that "[t]he only performance standard relevant to Gentile's compliance with § 3.A., for which there is evidence in the record, is '*registration effectiveness*.' As discussed, registration effectiveness is the ratio of the number of Nissan's sold to customers located in a dealer's [Primary Market Area] (*i.e.,* registrations), regardless of which dealer sold them, to the expected registrations of Nissans in the [Primary Market Area]." (Emphasis by Ralph Gentile.) There are two main problems with this contention. First, the Division determined that sales effectiveness, not registration effectiveness, was the appropriate standard to measure Gentile Nissan's compliance with

Section 3 of the term dealership agreement. That is certainly a reasonable construction of industry practice, and, therefore, under due-weight deference, is binding on us. Indeed, Ralph Gentile's expert witness at the hearing testified, albeit apparently reluctantly, that "[m]ost" automobile manufacturers "make, as far as I know, this [regional sales effectiveness] calculation in one form or another."

¶ 22. Second under our *de novo* review of the agreement, the whole thrust of Section 3 is, as the section's heading says, the dealer's **"Vehicle Sales Responsibilities"** (bolding in original); the marketing obligations are focused on the dealer successfully *selling* Nissan vehicles. To read Section 3's command that Gentile Nissan "shall actively and effectively promote through its own advertising and sales promotion activities the sale . . . of Nissan vehicles to customers located within the Dealer's Primary Market Area" as license to ignore whether Gentile Nissan actually sold Nissan vehicles would transform the dealership agreement into one for mere advertising. As Nissan North America pithily observes, "Gentile was a car dealer, not an advertising agency."

¶ 23. The Division properly found "just provocation."

D. *Due Regard to the Equities.*

■■■

¶ 24. Ralph Gentile argues that the Division misinterpreted the requirement in Wis. Stat. § 218.0116(1)(i)1.a that the "treatment in enforcing" the sales-effectiveness provisions in Gentile Nissan's term dealership agreement must "not [be] discriminatory compared to similarly situated dealers" by excluding

non-Wisconsin Nissan dealers from the "similarly situated" population. It contends that "[s]everal [out-of-state] dealers had lower sales penetration than Gentile, but, unlike Gentile, were not terminated by Nissan for unsatisfactory sales." Ralph Gentile points out that the legislature did not specify in § 218.0116(1)(i)1.a that "similarly situated" was restricted to Wisconsin dealers, as it could have, and as it did in WIS. STAT. § 218.0125(5), by using the phrase "similarly situated franchised motor vehicle dealers in this state."[8] It also argues that even though WIS. STAT. § 135.02(4)(a) also uses the stand-alone phrase "similarly situated dealers," two courts have construed that phrase to encompass out-of-state dealers.[9] *See Wisconsin Music Network, Inc. v. Muzak Ltd. Partnership*, 822 F. Supp. 1332, 1337 (E.D. Wis. 1992) (assuming that an out-of-state licensee was "similarly situated" to an instate licensee, but finding no

---

[8] WISCONSIN STAT § 218.0125(5) reads in full:

A manufacturer, importer or distributor who fails to compensate a dealer for parts at an amount not less than the amount the dealer charges its other retail service customers for parts used to perform similar work shall not be found to have violated this section if the manufacturer, importer or distributor shows that the amount is not reasonably competitive to the amounts charged to retail service customers by other similarly situated franchised motor vehicle dealers in this state for the same parts when used by those dealers to perform similar work.

[9] WISCONSIN STAT. § 135.02(4) defines "good cause" for the Wisconsin Fair Dealership Law. It reads, as material:

"Good cause" means:

(a) Failure by a dealer to comply substantially with essential and reasonable requirements imposed upon the dealer by the grantor, or sought to be imposed by the grantor, which requirements are not discriminatory as compared with requirements imposed on other similarly situated dealers either by their terms or in the manner of their enforcement.

disparate treatment) (commerce clause not discussed), *aff'd* 5 F.3d 218 (7th Cir. 1993) (commerce clause not discussed); *Advanced Agri-Systems, Ltd. v. Southwestern Porcelain, Inc.*, No. 81–C-352, 1982 U.S. Dist. LEXIS 18400, *30 (W.D. Wis. 1982) (assuming that out-of-state franchisees were "similarly situated" to an in-state franchisee).

¶ 25. It may be, in light of the legislature's use of the phrase "in this state" in Wis. Stat. § 218.0125(5) but not in Wis. Stat. § 218.0116(1)(i)1.a, that the legislature meant to encompass out-of-state dealers in the due-regard-to-the-equities analysis. But our review, as we have already seen, is not *de novo;* under the applicable due-weight-deference standard of review, we must affirm the Division's interpretation of § 218.0116(1)(i)1a if it is "reasonable." In light of the serious federal commerce-clause problems that might result if a Wisconsin law forced an automobile company to either terminate dealerships in another state based on Wisconsin-law criteria, *see Healy v. Beer Institute, Inc.*, 491 U.S. 324, 336–337 (1989), or forego terminating a Wisconsin dealer that was not effectively selling cars, the Division's restriction of the "similarly situated" mandate to Wisconsin dealers is reasonable, "not contrary to the clear meaning of the statute," and Ralph Gentile's interpretation is not "more reasonable."[10] *See*

---

[10] *Healy v. Beer Institute, Inc.*, 491 U.S. 324, 336–337 (1989) explained how a state law might impermissibly impinge on interstate commerce:

Taken together, our cases concerning the extraterritorial effects of state economic regulation stand at a minimum for the following propositions: First, the "Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State," and, specifically, a State may not adopt legislation that has the practical effect of establishing "a scale of

> prices for use in other states." Second, a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature. The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State. Third, the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation. Generally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State.

(Quoted sources and internal citations omitted; ellipsis in original.) Significantly, both *Wisconsin Music Network, Inc. v. Muzak Ltd. Partnership*, 822 F. Supp. 1332, 1337 (E.D. Wis. 1992), *aff'd* 5 F.3d 218 (7th Cir. 1993) and *Advanced Agri-Systems, Ltd. v. Southwestern Porcelain, Inc.*, No. 81–C-352, 1982 U.S. Dist. LEXIS 18400, *30 (W.D. Wis. 1982), relied on by Ralph Gentile, did not even discuss, no less decide, whether the commerce clause prohibited the extra-territorial reach of Wisconsin's Fair Dealership Law to affect out-of-state dealers. Ralph Gentile also cites *Forest Home Dodge, Inc. v. Karns*, 29 Wis. 2d 78, 93–94, 138 N.W.2d 214, 222 (1965) (A statute that prohibited an automobile manufacturer from applying for a Wisconsin dealership did not place an "undue" burden on interstate commerce so as to violate the commerce clause when the manufacturer could accomplish the same thing by buying an existing dealership.), and *Wisconsin Truck Center, Inc. v. Volvo White Truck Corp.*, 692 F. Supp. 1010, 1017–1018 (W.D. Wis. 1988) (upholding the then existing Wisconsin Motor Vehicle Dealership Law against a challenge that it violated the commerce clause by limiting the rights of out-of-state distributors to terminate Wisconsin dealers) ("Volvo GM's absurd contention that the [Wisconsin Motor Vehicle Dealership Law] prohibits 'newly appointed distributors' from ever terminating dealers is apparently the heart of this twisted analysis."),

*By the Court.*—Order affirmed.

*aff'd in part, rev'd in part, by unpublished order,* 894 F.2d 1338 (Table) (7th Cir. 1990) (affirming district court's ruling that non-discriminatory withdrawal from market did not violate Wisconsin's then-extant Motor Vehicle Dealer Law; reversing district court's denial of attorney fees) (constitutional issue not discussed) (unpublished order not available on Westlaw, but is on file with the clerk of the court of appeals), in support of its proposition that some Wisconsin laws can affect interstate commerce without violating the commerce clause. Of course. Unlike those cases (where the focus was mainly on what an out-of-state company could or could not do in affecting the rights of Wisconsin companies), however, if Ralph Gentile's "similarly situated" argument was applied here, Wisconsin's law would, as noted in the main body of this opinion, force an automobile company to either terminate dealerships in another state based on Wisconsin-law criteria, or forego terminating a Wisconsin dealer that could not sell cars. This would give Wisconsin law a more significant extra-territorial effect than there was in the cases upon which Ralph Gentile relies. We note, though, that we do not *decide* the constitutional issue; we merely hold that given the potential commerce-clause problems, the Division's interpretation of WIS. STAT. § 218.0116(1)(i)1.a was, in light of the section's clear language, "reasonable."